Robert L. ARTHUR, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CF–1189.

District of Columbia Court of Appeals.

Argued Nov. 21, 2006.
Decided Dec. 31, 2009.

Jerry Ray Smith for appellant.

Blanche L. Bruce, Assistant United States Attorney, for appellee. Kenneth L. Wainstein, United States Attorney at the time the brief was filed, Roy W. McLeese III, Elizabeth Trosman, and Michael A. Humphreys, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ, GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges.

RUIZ, Associate Judge:

Appellant, Robert L. Arthur, was indicted for distribution of marijuana and possession with intent to distribute (PWID) marijuana [1] subject to an enhanced penalty in light of appellant's prior drug conviction for distribution of marijuana.[2] Following a jury trial, appellant was convicted of the distribution charge; he was acquitted on the PWID count but convicted of the lesser-included offense of possession of marijuana.[3] On appeal, he argues that the trial court erred by making comments on the likely impact of his testimony on the jury after he had expressed his intention to testify, comments which led him to change his mind and waive his constitutional right to testify in his own defense. We agree, and conclude that the trial court's intervention constituted plain error. We, therefore, reverse the judgment of conviction for distribution and remand the case for a new trial.[4]

1. *See* D.C.Code § 48–904.01(a)(1) (2001).

2. D.C.Code § 48–904.01(a)(1) (2001) makes it a felony to distribute drugs or possess drugs with the intent to distribute them. The sentence of a person convicted of a "second or subsequent drug offense" may be enhanced by imprisonment "up to twice the term otherwise authorized, fined an amount up to twice that otherwise authorized, or both." D.C.Code § 48–904.08(a).

3. Appellant was committed to jail after he was found guilty in June 2003; he was sentenced on September 3, 2003, to 15 months of imprisonment, followed by 3 years of supervised release for distribution, and 150 days of imprisonment for possession. Each sentence was ordered to run concurrently with any other sentence. Thus, appellant would have been released from prison in 2004, before the briefs on appeal were submitted to the court in April 2006.

4. As we explain, see note 26, *infra,* the conviction for marijuana possession is unaffected by our finding of plain error with respect to the conviction for distribution, and is affirmed.

## I. Statement of the Facts

At trial the government presented evidence that at 7:40 p.m. on July 23, 2002, Metropolitan Police Department (MPD) Investigator Jerome McClinton, acting under cover, approached a man on Girard Street, N.W., and said he wanted to buy two ten-dollar bags of marijuana. According to Investigator McClinton, the man agreed and told the investigator to follow him into an adjacent alley. McClinton did so, and, as he entered the alley, he saw another man leave the alley. The man who walked with McClinton into the alley gave him two clear ziplock bags containing a "greenish weed substance," and McClinton paid with a pre-recorded twenty-dollar bill.

After receiving a lookout description from Investigator McClinton, Investigator Stephanie Garner saw a man leaving the alley and getting into the back seat of a black Volkswagen Jetta.[5] Investigator Garner and her partner followed the car until it was stopped by an arrest team that had responded to a broadcast of Investigator McClinton's description of the seller.[6] As Investigator Tyrone Hunt, a member of the arrest team, approached the Volkswagen, he saw appellant "stuffing something, doing a motion with his right hand." When Investigator Hunt asked appellant to step out of the car, he saw that appellant was holding a white piece of paper with a greenish substance in it. On the seat where appellant had been sitting, the arresting officers found $475 in cash strewn about, including the pre-recorded twenty-dollar bill. In addition, the officers found one ziplock bag containing a greenish substance (that later tested positive for marijuana) in the area where appellant had been seen "stuffing" something with his right hand. After appellant was arrested, Investigator McClinton rode by and identified him as the person who had sold him the marijuana in the alley.

Defense counsel set out in his opening statement the theory of the defense: that appellant had entered the alley to purchase drugs—not to sell them—and that the police had mistaken him for the person who sold marijuana to Investigator McClinton. Counsel proposed that it was the third person Investigator McClinton had seen leaving the alley who had sold him the drugs, and that appellant had purchased from this same person the one ziplock bag of marijuana that was later found in the car. Defense counsel proffered that "the facts will show" that the pre-recorded bill found in appellant's constructive possession was the change he had received from the actual seller after the undercover police officer had used it to pay for the drugs he purchased.

At the beginning of the second day of trial, defense counsel told the trial judge that there was a preliminary matter con-

---

**5.** Investigator Garner testified that there was still daylight that summer evening.

**6.** Investigator McClinton testified that he broadcasted a description of the seller as "a black male, about five six, five five, somewhere around there, black shorts and black and red shirt and a white shirt." Investigator Garner confirmed that Investigator McClinton described the seller to her as wearing "black shorts and [a] black and red shirt." Investigator Garner testified that she observed a person wearing black shorts leave the alley after McClinton and enter a black Volkswagen Jetta. She then followed the vehicle "as close as possible" until the arrest team pulled over the Jetta. Investigator Hunt, who was part of the arrest team, also confirmed that the lookout described a man wearing a "black shirt with red on it," and that appellant's clothes matched the lookout description. Although photographs of the driver and front passenger were admitted into evidence, the government did not proffer a photograph of appellant as he appeared that night.

cerning proof that would be presented, as part of the government's case, of appellant's prior conviction for "distribution or possession with intent to distribute marijuana" that needed to be resolved before the court resumed trial:

> **Defense Counsel:** ... There is a preliminary matter, Your Honor. I originally said we would stipulate to [appellant's] prior conviction. He doesn't want to stipulate to it. I guess the Government has to introduce a certified copy.
>
> **The Court:** Mr. Arthur, you need to think about this, because if the nature of the [prior] conviction becomes apparent to the jury that you have been previously convicted of possession with intent to distribute a controlled substance, or distribution of a controlled substance and you are charged with that same offense now, they will think that is what you do, you are a drug dealer. So what we are trying to do is make sure they don't know what the nature of the charge is, just that you have a prior conviction under the statute.
>
> The reason we are doing it this way is it would prejudice you greatly if the jury knew that you got a conviction for the same type of offense that you are on trial for.
>
> **Defense Counsel:** *He intends to testify to it, I believe.* So it could come out there. . . .
>
> **The Court:** ... If you want a stipulation, then the Government can['t] put in

the nature of the prior conviction. It is completely up to you. We are trying to protect your rights. Do you understand what I am saying? You have to answer yes or no.

> **Defendant Arthur:** Yes.
>
> **The Court:** It may very well be if you decide the only way you can get your defense before the jury is that you are going to have to testify, that is a decision you and your lawyer have to make. But if you understand the issue now, the Government is willing to have a stipulation that indicates you were simply convicted of a violation of a statute and not bring out the violation.
>
> We can leave it at that now and you and your lawyer could decide whether you will testify. If you decide to testify and it comes out, that is how it will be, but it will give you some more time to think about that issue; okay?
>
> **Defendant Arthur:** Yes.
>
> **The Court:** Okay. We will have the stipulation then; is that okay with you?
>
> **Defendant Arthur:** Yes.[7]

(emphasis added).

After the government presented its evidence to the jury, the judge addressed appellant directly:[8]

> Mr. Arthur, you now have to make a decision about whether or not you wish to testify or not. If you wish to present any evidence to this jury with regard to why you were in the alley and what you did in the alley, and anything other,

---

**7.** The prosecutor had proffered in opening statement that she expected to introduce the prior conviction by stipulation. After appellant's concession, the court admitted the stipulation into evidence. The court then briefly instructed the jury that "a stipulation is an agreed upon statement of facts or testimony that you can consider as undisputed. . . ."

**8.** The trial court had been made aware that if the defense wanted to present testimony, it would have to come from appellant. Defense counsel told the court before trial that appellant knew the potential witnesses only by their street names, "and was unable to give [counsel] enough information [so] that [he] could find them." On the second day of trial, counsel told the court that "[appellant] has been unable to find the witnesses, though we did go out and spend a couple hours canvassing the neighborhood."

information you want them to know that obviously hasn't come out from the Government's evidence, other than another person was in that alley and left but wasn't dressed like you, you are going to be the only person who could provide it.

I will give you another five minutes or so to talk to [your counsel] to see if you wish to testify. Obviously, if you wish to testify as [your counsel] has advised you, the Government will impeach you with your prior criminal convictions. That will simply go to your believability as a witness. It won't be offered to prove that you are guilty of this offense. It will affect whether or not they believe you or not. The government won't be able to argue because he has been convicted before, that must mean he did it again. They can't argue that. But the jury will certainly learn if you testify that you have previously been convicted of a distribution or possession with intent to distribute offense.

So you and your lawyer need to balance all these things together.... If you think you need to testify, that is completely up to you.

The trial court recessed for five minutes to give appellant time to consult with counsel. After the recess, appellant himself unambiguously informed the trial court that he wished to testify:

I want to. I would like the jury to find out what I was doing in the alley. Bu[t] by the prosecutor, it never came out, I told my attorney what happened. I don't see how even if I don't, how they are gonna find out what I believe to be the truth.

The judge indicated that he accepted appellant's decision, saying, "That's fine. If you wish to testify, that's fine." Then the prosecutor interjected:

Your Honor, there are several prior convictions the Government would seek to impeach him with. I just want to go over with the Court, the Government has certified copies of convictions for distribution of marijuana, two [violations of the Bail Reform Act], an escape charge....[9]

Although appellant had already twice indicated that he wished to testify—once through his attorney and once in his direct statement to the judge—the trial court, again *sua sponte*, questioned appellant regarding his decision to testify:

**The Court:** ... Given the nature of the charge I will preclude [the prosecutor] from impeaching him with that rape conviction *if he decides to take the stand.*

Anything else?

Mr. Arthur, let me tell you this: We have to get started now. *I know it's a difficult decision,* but life is full of difficult decisions. I know your lawyer can give you his best professional advice. You said on the record already you don't know how the jury is going to believe any other version than the Government's version unless they have another version to consider. That is completely a reasonable thing for you to conclude. Only you could make a decision on whether you wish to testify.

Your lawyer can say I have tried hundreds of cases and he may think once the jury hears about the prior convictions that is all they will think about. That may be reasonable too. But you have to do what you think is in your own best interests. This is the time you have to do it. I will bring the jury back

9. The prosecutor also proffered a second-degree rape conviction from Maryland in 1991, for which it did not have a certified copy, and which, by the time of trial, was over ten years old. The trial court denied its use for impeachment. *See* D.C.Code § 14–305 (2001).

in. If you want to testify, you can testify. If you don't want to, you think once they hear about your convictions they don't think about anything else but your convictions. But you have to make the decision now, I can't wait any longer. It is completely up to you, it can only be your decision. Your lawyer is not facing conviction or jail; only you are. He gives you his best professional advice. What would you like to do? Yes, sir? What would you like to do?

**Defendant Arthur:** Not testify.

**The Court:** You are not going to testify? You have to answer yes or no for the record.

**Defendant Arthur:** I won't testify.

**The Court:** You understand now, if you don't testify and you want to tell the jury something they will never hear it from your mouth; do you understand?

**Defendant Arthur:** Yes.

**The Court:** Having discussed this with your lawyer and having had the discussion we have had together, is it your personal decision you don't think it is in your best interest to take the stand and testify in this case?

(Pause.)

**The Court:** Mr. Arthur?

**Defendant Arthur:** I didn't hear you.

**The Court:** Do you want to testify, yes or no?

**Defendant Arthur:** No.

**The Court:** Mr. Arthur has made a decision not to testify on his own be-half.... On behalf of Mr. Arthur, is there any evidence?

**Defense Counsel:** No, Your Honor. Mr. Arthur has decided not to put on any evidence at all in his case.

After deliberation,[10] the jury convicted appellant of distribution and possession of marijuana.

## II. Standard of Review

■■■■ Appellant contends that the trial judge's comments were improper and had the effect of coercing him not to take the stand, depriving him of his constitutional right to testify in his own defense. When, as in this case, there was no objection at trial to the error challenged on appeal, we are confined to review for plain error. *See Thomas v. United States,* 914 A.2d 1, 8 (2006). To demonstrate plain error, appellant must show that: (1) there is error, (2) the error is plain, meaning clear or obvious, and (3) the error affected substantial rights. *Id.* (citing *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Even when the error meets these requirements, an appellate court need not notice it unless appellant also demonstrates that the error resulted in "either a 'miscarriage of justice,' that is, actual innocence; or that the trial court's error ... 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *See Wilson v. United States,* 785 A.2d 321, 326 (D.C.2001) (quoting *Olano,* 507 U.S. at 736, 113 S.Ct. 1770). As we now discuss, we conclude that reversal is warranted under plain error review.[11]

---

10. The court released the jury to deliberate at 12:20 p.m. At 2:10 p.m. the jury sent a note to the court: "Judge Cushenberry, does the second charge [possession] refer only to the third bag of controlled substance or to all three bags?" After conferring with the prosecutor on the government's theory of the case, the judge instructed the jury that the possession charge related only to the single bag of marijuana found in the car. Deliberations continued that afternoon. The next day, the jury announced at 9:55 a.m. that it had reached a verdict.

11. While we apply the plain error rule in this situation, we do so with considerable doubt as to whether a contemporaneous objection would have been efficacious, since it is hard to imagine what effective remedial action the

## III. Analysis

### A. Did the trial court commit error?

■ The right of a defendant to testify at trial is not found in the text of the Constitution. Indeed, under the common law, a party was disqualified from giving testimony at his own trial because it was believed that he naturally would be biased. *See Ferguson v. Georgia,* 365 U.S. 570, 573, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961). It was not until the nineteenth century that a party's right to give sworn testimony was recognized by state and federal statutes. *See id.* at 577, 81 S.Ct. 756. But, as the Supreme Court has stated, "[a]t this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas,* 483 U.S. 44, 49, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). The Court has recognized that the right to testify is "fundamental,"[12] and is derived from "several provisions in the Constitution":

It is one of the rights that "are essential to due process of law in a fair adversary process." *Faretta v. California,* 422 U.S. 806, 819, n. 15[95 S.Ct. 2525, 45 L.Ed.2d 562] ... (1975). The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and offer testimony.... *In re Oliver,* 333 U.S. 257, 273[68 S.Ct. 499, 92 L.Ed. 682]

... (1948). *See also Ferguson* ..., 365 U.S., at 602[81 S.Ct. 756, 5 L.Ed.2d 783(1961)] ... (Clark, J., concurring) (Fourteenth Amendment secures "right of a criminal defendant to choose between silence and testifying in his own behalf").

The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call "witnesses in his favor,".... *Washington v. Texas,* 388 U.S. 14, 17–19[87 S.Ct. 1920, 18 L.Ed.2d 1019] ... (1967). Logically included in the accused's right to call witnesses whose testimony is "material and favorable to his defense," *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867[102 S.Ct. 3440, 73 L.Ed.2d 1193] ... (1982), is a right to testify himself, should he decide it is in his favor to do so....

Moreover, in *Faretta* ... the Court recognized that the Sixth Amendment "grants to the accused *personally* the right to make his defense." ... A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.

The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. In *Harris v. New York,* 401 U.S. 222, 230[91 S.Ct. 643, 28 L.Ed.2d 1] ... (1971), the Court stated: "Every

---

trial judge could have taken had there been a contemporaneous objection to his comments (short of granting a mistrial, which appears unlikely in the circumstances). A disavowal by the judge of the implications of what he had just said does not strike us as particularly curative. *See, e.g., Comford v. United States,* 947 A.2d 1181, 1186 (D.C.2008) (noting that a purpose of requiring contemporaneous objection is to permit the trial judge to "correct the situation without jettisoning the trial") (quot-

ing *Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992)).

**12.** *See Rock,* 483 U.S. at 53 n. 10, 107 S.Ct. 2704 ("On numerous occasions the Court has proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right.").

criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Id.* at 225[91 S.Ct. 643].... Three of the dissenting Justices in that case agreed that the Fifth Amendment encompasses this right: "[The Fifth Amendment's privilege against self-incrimination] is fulfilled only when an accused is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' ... The choice of whether to testify in one's own defense ... is an exercise of the constitutional privilege." *Id.* at 230[91 S.Ct. 643]....

*Id.* at 51–53, 107 S.Ct. 2704 (footnotes omitted) (alterations in original).

■ Because the right to testify is a fundamental and personal right, it can be waived only by a defendant's voluntary, knowing, and intentional action. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 241, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("It is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, *testify in his or her own behalf,* or take an appeal. In addition, we have held that, with some limitations, a defendant may elect to act as his or her own advocate ...." (emphasis added) (citations omitted)); *Boyd v. United States,* 586 A.2d 670, 677 (1991) (citing *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). To ensure that a defendant's waiver is effective, we have recommended-

but not required-that trial courts conduct an on-the-record colloquy advising defendant of the right to take the stand in his own defense. *Boyd,* 586 A.2d at 676; *see also Smith v. United States,* 837 A.2d 87, 99 (2003) ("While not deciding whether the trial court had a duty, *sua sponte,* to conduct an inquiry ... it would be prudent to make an inquiry on the record to avoid the issue on appeal or in collateral attacks.").

■ In contrast, when a defendant asserts his right *to* testify, we have refrained from making a similar recommendation with regard to the right *not* to testify. *Pinckney v. United States,* 906 A.2d 301, 307 (D.C.2006) ("[W]here the defendant elects *to* testify on his own behalf ... *Boyd* does not govern."); *see also Pitt–Bey v. District of Columbia,* 942 A.2d 1132, 1139 n. 13 (D.C.2008) ("[W]e need not decide whether the trial court is required to conduct a colloquy in every case in which there is a testifying defendant to ensure that he or she is knowingly, intelligently, and voluntarily waiving his or her privilege against self-incrimination."). Our reluctance is grounded on the interrelated concerns of judicial over-involvement in the proceedings and judicial interference in the attorney-client relationship. We caution, as has the D.C. Circuit Court of Appeals, that "defense counsel, not the court, has the primary responsibility for advising the defendant of his right to testify and for explaining the tactical implications for doing so or not." *United States v. Ortiz,* 317 U.S.App. D.C. 262, 266, 82 F.3d 1066, 1070 (1996).[13]

---

**13.** We recognize that exercise of the right to testify necessarily implicates waiver of the right to remain silent. *See United States v. Pennycooke,* 65 F.3d 9, 11 (3d Cir.1995) ("Exercise of either the right to testify or the right not to testify necessarily would waive the other right."). The concern about excessive judicial intervention and intrusion into the attorney-client relationship that obtains in connection with informing a defendant of the right not to testify once he has asserted the right to testify, however, is not present when the judge simply informs a defendant that he has the right—but no obligation—to take the stand because the government has the burden of proof.

■ Here, appellant initially asserted his right to testify through counsel, and then, after consulting again with his lawyer, confirmed his decision in a colloquy with the trial judge. Ultimately, however, appellant decided not to testify after the judge addressed him, not merely to inform him of the right to testify or not, but also on the *advisability and the risk* of taking the stand. See Statement of the Facts, Section I, *supra.* That the trial court, per *Boyd,* also conducted an inquiry to establish that appellant's waiver of the right to testify was knowing, intelligent, and voluntary, does not redeem the error appellant claims because the circumstances, taken as a whole, call into question the validity of his waiver. *See Hunter v. United States,* 588 A.2d 680, 681 (D.C.1991) ("Whether a defendant has validly waived his or her right to testify will depend on the particular circumstances of each case.").

■ The doubt about the validity of the waiver in this case arises from the fact that the trial court, without any apparent cause, appears to have questioned the wisdom of appellant's decision to testify, even though, as the court knew, appellant had moments before consulted with counsel on the subject and unequivocally asserted that he wished to testify. However, as we have stated, "[a]lthough a defendant who chooses to testify may actually decrease his or her chance of acquittal, nonetheless, '[t]he wisdom or unwisdom of the defendant's choice does not diminish his right to make it.'" *Boyd,* 586 A.2d at 673–74 (quoting *Wright v. Estelle,* 572 F.2d 1071, 1079 (5th Cir.1978) *aff'd en banc,* 572 F.2d 1071 (5th Cir.1978) (Godbold, J., dissenting)). In probing appellant's decision to testify, the trial court went beyond the realm of proper judicial inquiry—whether the defendant is informed of his right to testify and has made a decision—to imper-missibly questioning the wisdom of the defendant's actual decision.

■ Moreover, a trial judge has a responsibility to ensure that the weight of judicial authority does not unduly influence a defendant's exercise of a right, particularly a personal and fundamental right grounded in the Constitution. *See Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (noting that the "great disparity between the posture of the presiding judge and that of the witness" could exert "such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify"). In *Webb,* the sole defense witness abandoned his decision to testify after the trial judge "gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury." 409 U.S. at 97, 93 S.Ct. 351. The witness, who had a criminal record and was serving a sentence at the time, had indicated his intent to testify by appearing in court. *Id.* at 95, 93 S.Ct. 351. By venturing beyond simply informing the witness about the right not to testify and the obligation to tell the truth if he did, "the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances of parole." *Id.* at 97, 93 S.Ct. 351. The Court reversed because the "judge's threatening remarks ... effectively drove that witness off the stand, and thus deprived the [defendant] of due process of law...." *Id.* at 98, 93 S.Ct. 351.

We dealt with a similar issue in *Yates v. United States,* 513 A.2d 818 (D.C.1986), where we distinguished *Webb.* Although we ultimately held that the trial judge's remarks to a witness about his decision to testify were not unduly coercive, we stated

that because they were "unnecessarily repetitive and emphatic," we had cause to be "concerned . . . that the cumulative effect of the judge's comments may have created a real possibility that [the witness] changed his story in response to judicial coercion." *Id.* at 823. In *Yates,* counsel asked that the defendant's trial be severed from that of the codefendant, who had made a statement to counsel that exculpated the defendant. *Id.* at 820. Counsel "stressed that [the codefendant's] statement would be unavailable to appellant in a joint trial because [the codefendant] announced he would not testify." *Id.* The trial judge recognized that under *Jackson v. United States,* 329 A.2d 782, 787–88 (D.C.1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975), the proffered exculpatory testimony of one codefendant might be a ground for severance if that testimony would be unavailable at a joint trial. *Id.* In an effort to determine whether the statement was truly exculpatory, the judge told the codefendant to confer with his counsel. *Id.* But then, as we noted, the trial judge took matters into her own hands:

> [The judge then] noted that [the codefendant's] statement to appellant's counsel was not totally exculpatory because so much had been left out. She explained that [the codefendant] would be subpoenaed and then asked specific questions on direct and cross-examination to supplement the incomplete information in his written statement. Answering these questions under oath would be quite different from simply signing a witness statement, she said. She told [the codefendant] he must "keep in mind . . . the possible penalty of perjury." The judge emphasized that she did not want to scare [the codefendant]; she just wanted him to tell the truth. "But it's not going to be the truth on a piece of paper where he can

walk away." She also stressed that [the codefendant] should not "bail out a friend by lying." She then said that if [the codefendant] told the truth, she would accept that, "whatever it may be." She reiterated that, if [the codefendant] was telling the truth, she would sever the cases. "And it better be the truth," she implored. "That's all I'm saying because this Court will not tolerate perjury."

*Yates,* 513 A.2d at 821.

After the codefendant conferred with counsel, counsel told the court that his client "could not" exculpate the defendant, and "conceded that, if effectively cross-examined, [his client] would probably make statements" inculpating the defendant. *Id.* The court denied the motion for severance. *Id.* at 822. The next day, the codefendant pleaded guilty and testified for the government at defendant's trial. *Id.*

We expressed concern in *Yates* that, as in *Webb,* the trial court had gone too far in admonishing the witness:

> Although the judge did mention several times that she would accept the truth—"that's fine," "whatever it may be"—she also urged [the codefendant] at least ten times to tell the truth, or not to lie, or to be honest. At least twice, moreover, she stressed that "it better be the truth" because "this Court will not tolerate perjury," and she expressly urged [the codefendant] not to "bail out a friend by lying." The judge also repeated several times that she wanted [the codefendant] to confer with his attorney. Finally, although the judge never said—before [the codefendant] conferred with counsel—that she did not believe [the codefendant's] second statement [exculpating defendant], her remarks, taken in their entirety, implied doubt about the version

of the facts [the codefendant] provided [defendant's] attorney in that statement.

*Id.* at 823. Comparing the trial judge's comments in *Yates* with those that the Supreme Court found impermissible in *Webb,* we held that because the judge's statements in *Yates* were not so "gratuitous" and did not appear to have influenced the witness's decision not to testify, they did not require reversal.

In a close case, we conclude that the judge did not commit reversible error for four reasons. First, . . . her comments were not altogether gratuitous, as in *Webb.* The judge had a legitimate basis for determining what testimony [the witness] would give and, as in *Reese,*[14] alerting [the witness] to the consequences of potential perjury.

Second, [the witness's] written statement [to defense counsel] . . . was so guardedly exculpatory of [the defendant] that the judge had a reasonable basis for wondering about its veracity; the judge, accordingly cannot be faulted for stressing more vigorously than usual the importance of telling the truth.

Third, [the witness's] attorney shared responsibility with the judge for advising [the witness]. . . . It is most unlikely . . . that counsel would have advised [the witness] any differently if the judge had been less repetitive and emphatic. . . .

Fourth, the judge's statement to [the witness] about the danger of lying before one's own sentencing judge, *see Webb* . . ., as well as the judge's expressed belief that [the witness's] written statement was untrue, occurred after [the witness's] counsel had advised the court that [the witness] would stick with his original story [inculpating defendant].

*Id.* at 824.

Here, even though we perceive that the trial judge's actions were motivated by concern for the defendant, we conclude that they were more aligned with what the Court deemed impermissible in *Webb,* than what we considered excusable in *Yates.* None of the four reasons that justified the judge's intervention in *Yates* is present here. First, the trial judge had no legitimate basis for questioning the relative merits of appellant's choice to testify. Unlike in *Yates,* where the judge's decision on the severance motion depended in part on the exculpatory nature of the codefendant's proffered testimony, in the context of a defendant's choice to testify, the degree to which that testimony will benefit or hurt his cause is beyond the scope of judicial intervention. *See Faretta,* 422 U.S. at 834, 95 S.Ct. 2525 ("And although he may conduct his own defense ultimately to his own detriment, his choice must be honored. . . ."); *Boyd,* 586 A.2d at 673 (noting that "[t]he wisdom or unwisdom of the defendant's choice does not diminish his right to make it" (quoting *People v. Curtis,* 681 P.2d 504, 511 (Colo.1984))); *see also Ortega v. O'Leary,* 843 F.2d 258, 261 (7th Cir.1988) ("If a defendant insists on testifying, no matter how unwise such a decision, the attorney must comply with the request.").

Second, the judge had no reason to believe that appellant was planning to commit perjury. By saying he was a drug user and had purchased drugs, appellant would have shown some candor and, even if his testimony were eventually rejected by the jury, there is nothing in what he proposed to say that should have alerted

---

**14.** In *Reese v. United States,* 467 A.2d 152, 158 (D.C.1983), we held that the trial court did not intimidate the defense witness by in- forming him of his Fifth Amendment right not to testify and the consequences of perjury.

the judge to perjury. Therefore, unlike in *Yates*, the trial judge in this case had no reason to believe that he had a "shared responsibility" with counsel to advise appellant. Appellant was represented by counsel and the trial judge had recessed the proceedings moments before so appellant could confer with his lawyer on this issue, thereby eliminating the need (absent some compelling reason not present here [15]) for the trial court to provide any additional advice to appellant. Appellant, in any event, had twice indicated to the court that he had already made the decision to testify-once through counsel and again, speaking for himself, in response to the court's question, which occurred after the five-minute recess for appellant to confer with his lawyer. Moreover, appellant, who had been unable to secure any other witnesses, had explained to the judge that he wanted the jury to know that he was in the alley to buy—not sell—drugs, and how he came to have the pre-recorded twenty dollar bill. At that point, knowing that appellant had said in open court that he wished to testify after consulting with his lawyer, the trial court had no reason to doubt that appellant had made a knowing, intelligent, and voluntary decision to waive his right against self-incrimination and to choose, instead, to present his own testimony. Appellant, of course, knew that the trial court was aware of these facts. Just as

the comments by the trial court in *Webb* would have been understood by the witness as signaling the court's warning that it would be unwise to testify, the trial court's repeated comments to appellant, after having been informed of his decision to testify, would have signaled to any reasonable observer that the court did not believe it was a wise course. As both the law and common experience recognize, repetition of a question in the face of a clear answer communicates dissatisfaction with that answer and a suggestion that it should be reconsidered. *See, e.g., Epperson v. United States*, 495 A.2d 1170, 1176 (D.C.1985) (repetition of anti-deadlock instruction to a jury viewed as unduly coercing the jury to reach a verdict they otherwise would not have reached); *see also Yates*, 513 A.2d at 823 (noting that judge was "unnecessarily repetitious and emphatic").

Finally, unlike in *Yates*, where the codefendant had already indicated an unwillingness to exculpate the defendant before the court made its more threatening comments, the sequence of events in this case leaves us with little doubt that the trial court's actions created too much of a risk that appellant would "effectively [be] dr[iven] . . . off the stand." *Webb*, 409 U.S. at 98, 93 S.Ct. 351.[16] Viewed in con-

---

**15.** There is no indication in the record—and the government did not proffer one when asked at oral argument—that counsel or appellant had communicated to the judge any second thoughts or questions about appellant's articulated decision to testify. Nor is there any indication that the trial judge was concerned that defense counsel had not advised appellant on the matter.

**16.** The government argues that the court acted appropriately because it simply sought to inform appellant of the consequences of his decision to testify, immediately after the prosecutor had announced to the trial court the convictions (distribution of marijuana, and two failures to report to court and an escape charge) with which she intended to impeach appellant when he testified. There was no indication, however, that this came as a surprise to appellant. These were appellant's own convictions and, surely, he was already aware of their existence; there is no suggestion that defense counsel had not discussed their use as impeachment with him. Moreover, even *before* appellant unambiguously stated that he wished to testify, the trial court had made clear to appellant the potential consequences of the jury learning of his prior convictions. See Statement of the Facts, *supra.*

text, by continuing to suggest "reasonable" alternatives to the decision appellant had already made, the trial court implicitly refused to accept appellant's decision to testify and brought the power of the court to bear on appellant such that his subsequent decision not to testify cannot be said to have been truly voluntary. Any doubt we might have "must be resolved in favor of protecting the constitutional claim." *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *see also Zerbst,* 304 U.S. at 464, 58 S.Ct. 1019 (noting that courts should "indulge every reasonable presumption against waiver of fundamental constitutional rights") (quotation omitted).

In addition, the trial court's actions are of concern because they departed from that of a neutral magistrate. *See Foster v. United States,* 618 A.2d 191, 195 (D.C. 1992) ("Our own court has been one of the most vigilant in holding trial judges to a rigid standard of impartial appearance."). The trial judge's unsolicited advice about the pros and cons of taking the stand not only risked unduly influencing appellant's decision whether to testify, but also intruded into the role of defense counsel, creating the potential for misunderstanding of the proper judicial role. *See Brooks v. Tennessee,* 406 U.S. 605, 612, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) ("Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right."); *cf. United States v. Teague,* 953 F.2d 1525, 1533 (11th Cir. 1992) ("Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide."); *Pennycooke,* 65 F.3d at 11 ("The fact that a criminal defendant, depending on the facts and circumstances of the case, reasonably could choose either to testify or not to testify, ... is an important part of trial strategy best left to the defendant and counsel without the intrusion of the trial court, as that intrusion may have the unintended effect of swaying the defendant one way or the other."). By advising appellant of the possible consequences of taking the stand, the trial judge created a significant risk that appellant would set aside counsel's advice in favor of the judge's implied opinion that he *should* relinquish the right to testify.[17] *See State v. Albright,* 96 Wis.2d 122, 291 N.W.2d 487, 493 (1980) ("Such admonition is subject to abuse in interpretation and may provoke substantial judicial participation that could frustrate a thoughtfully considered decision by the defendant and counsel who are designing trial strategy.").

The government also contends that appellant could not have been coerced by the trial court's actions because the transcript clearly indicates that the trial court, on several occasions, stated that appellant had a choice about whether to testify, and that appellant has not established, as a factual matter, that it was the court's comments that led him not to testify. However, mere recitation that a defendant has a choice does not ensure that a defendant's decision was truly voluntary, especially if other statements made by the court send a contradictory message. We note that the trial court's comments—"It is completely up to you, it can only be your decision. It can't be your lawyer's decision. Your lawyer is not facing conviction or jail; only you are"—might have had the unintended consequence of applying further pressure on appellant to relinquish his right to testify by stressing the consequence (conviction or jail) of what the court perceived was the "wrong" decision.

**17.** We note that the trial judge said to appellant: "Obviously, if you wish to testify *as [your counsel] has advised you,* the government will impeach you with your prior criminal convictions." See Statement of the Facts, *supra.* (emphasis added).

To be clear, the error we identify in this case is not the simple act of confirming that a defendant who has expressed an intention to testify is aware he is under no obligation to do so. Here, the trial court committed error by questioning and advising appellant after he had conferred with counsel and had unequivocally stated his intention to take the stand in his own defense. Underlying the *Boyd* inquiry is the need to ensure that the defendant is advised of his right to testify, which the trial court initially did in this case, before providing an additional opportunity for counsel and client to confer. See Statement of the Facts, *supra.* By saying that he intended to take the stand after such consultation, appellant could not have made it any clearer that he understood he had a right to testify. Following appellant's statement, however, the court again spoke to appellant and reiterated its view of the strategic considerations at play and pressed for a decision without giving appellant further time to consult counsel ("You have to make the decision now. I can't wait any longer"). Under these circumstances, the court was not simply informing a defendant of his rights but imposing considerable pressure on the decision appellant had already made. Although the court acknowledged that appellant's explanation for wanting to testify was "completely reasonable," the trial court raised several other reasons why appellant might want to reconsider his decision, characterizing those suggestions as "reasonable too." [18] By continuing to offer these alternatives to the course appellant had already chosen after consulting with his lawyer, the trial court interjected itself without apparent cause into the role of counsel, potentially undermining appellant's confidence in his lawyer's advice and exerting undue pressure to accept what appellant could have perceived as the trial court's preferred strategy.[19] We conclude that the trial court erred.

## B. *Was the error clear or obvious?*

■ Relying on *Foreman v. United States,* 633 A.2d 792 (D.C.1993), and *United States v. Merlos,* 303 U.S.App. D.C. 395, 8 F.3d 48 (1993), for the proposition that the error must have been "clear under current law," see *Olano,* 507 U.S. at 734, 113 S.Ct. 1770, the government contends that the absence of a decided case that addresses the precise sequencing and phrasing of the trial court's actions in this case demands that even if there were error, it cannot be considered to have been so clear at the time as to warrant reversal under plain error review. Specifically, the government argues that since the trial court's action was not expressly prohibited by *Boyd,* we cannot conclude that the error was obvious. The government's argument presses too far, however, because trial judges are presumed to know and apply the legal principles enunciated in appellate decisions, and not simply to match factual scenarios, as few cases present the same facts. Moreover, as we have discussed, the error we find is the coercion applied by the trial court's actions in this case, which was not an issue in *Boyd.* Here, the error is not that the trial judge informed a defendant who had expressed a desire to testify about his right not to

18. The trial court cautioned, "Your lawyer can say I have tried hundreds of cases and he may think once the jury hears about the prior convictions that is all they will think about. That is reasonable too." As discussed *infra,* the trial court's concern that appellant would be prejudiced if he was impeached with prior convictions was, in the context of the case, greatly exaggerated.

19. The record does not reveal what counsel had advised appellant.

testify; the error in this case stems from the manner in which the trial court addressed the defendant, which seemed to challenge the defendant's assertion of his constitutional right to testify and undermine counsel's strategic advice. The evident potential for coercion was realized—as shown by appellant's sudden and otherwise unexplained change of heart immediately after the court's second colloquy—which renders the court's intervention clearly erroneous. That this was error is supported, as we have discussed, by the Supreme Court's opinion in *Webb,* and our opinion in *Yates. See Webb,* 409 U.S. at 97, 93 S.Ct. 351 ("The fact that [the witness] was willing to come to court to testify ..., refusing to do so only after the judge's lengthy and intimidating warning, strongly suggests that the judge's comments were the cause of [the witness]'s refusal to testify."); *cf. Yates,* 513 A.2d at 823 (noting that, "in a close case," the judge's statements did not require reversal due to presence of four factors, not present here). Accordingly, we conclude that the error in this case was clear.

C. *Did the error affect substantial rights?*

■ In *United States v. Dominguez Benitez,* 542 U.S. 74, 81, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), the Court stated that "relief for error is tied in some way to prejudicial effect, and the standard phrased as 'error that affects substantial rights,' used in [plain error review], has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding." However, unlike in cases of preserved error where the government bears the "burden" of showing that trial error was harmless, *Hinton v. United States,* 979 A.2d 663, 691 (D.C. 2009) (en banc), where error is not preserved and plain error review applies, there is no presumption of prejudice and,

in that sense, it is "the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Olano,* 507 U.S. at 734, 113 S.Ct. 1770. "In cases where the burden of demonstrating prejudice (or materiality) is on the defendant seeking relief, [the Court has] invoked a standard with similarities to the *Kotteakos* formulation in requiring the showing of 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" *Dominguez Benitez,* 542 U.S. at 81–82, 124 S.Ct. 2333 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (adopting the prejudice standard of *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))).

■ We must consider the nature of the error, however, for if it is structural in nature, the defendant's substantial rights will be deemed to have been affected, without need for further analysis in the context of the particular trial. *See United States v. Recio,* 371 F.3d 1093, 1101 (9th Cir.2004) (citing *United States v. Vazquez,* 271 F.3d 93, 100 (3d Cir.2001) and *United States v. David,* 83 F.3d 638, 646–47 (4th Cir.1996)). This conclusion follows logically from the Court's definition of structural errors as those where "[t]he entire conduct of the trial from beginning to end is obviously affected by the [error.]" *Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). A structural error is different from a "trial error," which is capable of being "quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless...." *Id.* at 307–08, 111 S.Ct. 1246.

Appellant cites *Boyd* for the proposition that denial of a defendant's fundamental right to testify defies review for harmless

error. *See id.,* 586 A.2d at 677–78 ("Further, in view of the nature of the defendant's right to testify, the trial judge's failure to hold a hearing to determine whether [the defendant] had waived her right to testify cannot be deemed harmless error."). While appellant has shied away from arguing that the error was structural and reversible *per se, see Fulminante,* 499 U.S. at 309, 111 S.Ct. 1246, he contends that the error was the functional equivalent of structural error because it is not amenable to review for harmlessness.

The Supreme Court has yet to decide whether the denial of the right to testify is structural in nature, but there would appear to be sound arguments to support the proposition that, like a violation of the right to represent oneself, violation of the right to take the stand in one's defense also is structural in nature. We have previously cited the dissent in *Wright,* where Judge Godbold eloquently described the importance of a defendant's right to testify:

> In making the choice on whether to testify, . . . the defendant elects whether to become an active participant in the proceeding that affects his life and liberty and to inject his own action, voice and personality into the process to the extent the system permits.

> In the narrow world of the courtroom the defendant may have faith, even if mistaken, in his own ability to persuasively tell his story to the jury. He may desire to face his accusers and the jury, state his position, and submit to examination. His interest may extend beyond content to the hope that he will have a personalized impact upon the jury or gain advantage from having taken the stand rather than to seek the shelter of the Fifth Amendment. Or, without regard to impact upon the jury, his desire to tell "his side" in a public forum may

be of overriding importance to him. Indeed, in some circumstances the defendant, without regard to the risks, may wish to speak from the stand, over the head of judge and jury, to a larger audience.

572 F.2d at 1078 (*cited in Boyd,* 586 A.2d at 674).

Quoting *Faretta,* 422 U.S. at 819, 95 S.Ct. 2525, which concerned the right to self-representation, the Court has said that "an accused's right to present his own version of events in his own words" is "[e]ven more fundamental to a personal defense than the right of self-representation." *Rock,* 483 U.S. at 52, 107 S.Ct. 2704. The Court also has observed that denial of the right to self representation is "not amenable to harmless error analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle v. Wiggins,* 465 U.S. 168, 177–78 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (quotations omitted); *see id.* at 198 n. 6, 104 S.Ct. 944 (White, J., dissenting) ("The nature of the right to defend *pro se* renders the traditional harmless error doctrine peculiarly inappropriate. Unlike other constitutional rights, the right to represent oneself is not 'result-oriented.' "). Judge Godbold's description of a defendant's right to take the stand in his own defense, quoted above, is striking in its similarity to the Court's observation, with respect to the right of self-representation, that "[t]he right to appear *pro se* exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." *Wiggins,* 465 U.S. at 177, 104 S.Ct. 944. "Because we cannot truly judge the effect of the defendant's being denied the right to take the stand, and because we should be concerned with protecting both the right to choose whether to testify and the substance of the testi-

mony," Judge Godbold wrote, harmlessness analysis is "entirely misplaced." *Wright,* 572 F.2d at 1081–82. "To apply such an outcome-determinative analysis at worst denigrates the position of the individual with respect to his own defense and trial and at best exhibits an unthinking paternalism toward criminal defendants." *Id.*

Notwithstanding the obvious parallels between the right to self-representation and the right to testify in one's own trial, the trend in the Circuit Courts is to analyze errors concerning the right to testify for harmlessness under the *Chapman* standard for constitutional error.[20] Where violation of a defendant's right to testify is the result of counsel's defective performance, courts apply *Strickland's* second prong, requiring prejudice to be established by showing that, but for counsel's defective performance, there is a reasonable probability of a different outcome. *Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[21]

**20.** *See Brown v. Artuz,* 124 F.3d 73, 80 (2d Cir.1997) (applying harmless error review and noting that where defendant would have testified only "to demonstrate that the prosecution failed to disprove his defense of justification beyond a reasonable doubt," argument for prejudice is weaker); *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir.1991) (holding that it was not harmless error for the court to refuse to exclude evidence of prior convictions, which resulted in defendant's decision not to take the stand); *United States v. Leo,* 941 F.2d 181, 195 (3d Cir.1991) (Although "[w]e believe that the district court abused its discretion when it ruled that [defendant] could not testify in his own defense . . ., that error does not provide the basis for a new trial if the error was harmless beyond a reasonable doubt."); *Ortega,* 843 F.2d at 262–63 (holding that trial court's refusal to reopen evidence to include defendant's testimony was constitutional error, and that "the context of the case will indicate whether the error was harmless beyond a reasonable doubt") (citation omitted); *United States v. Phillips,* 664 F.2d 971, 1042 (5th Cir. Unit B 1981) ("[E]ven if we assume that [defendant] did not waive his right to testify when he stated to the trial court that he no longer planned to take the stand, we conclude that the deprivation of [defendant's] right to testify in his own behalf was error that was harmless beyond a reasonable doubt . . . because the evidence of [defendant's] guilt was overwhelming.") *overruled on other grounds by United States v. Huntress,* 956 F.2d 1309, 1317 (5th Cir.1992); *Wright,* 549 F.2d at 974 ("Even if petitioner was deprived of such a personal constitutional right [to testify] . . . we are convinced . . . it was harmless error beyond a reasonable doubt."); *cf. Frey v. Schuetzle,* 151 F.3d 893, 898 n. 3 (8th Cir.1998) ("[W]e note that it is unclear if harmless error analysis applies to the denial of a defendant's right to testify."). We note that several federal trial courts have concluded that deprivation of the right to testify is structural error. *See, e.g., Hernandez v. Dugger,* 829 F.Supp. 372, 376–77 (M.D.Fla. 1993); *United States v. Butts,* 630 F.Supp. 1145, 1148 (D.Me.1986).

**21.** *See Owens v. United States,* 483 F.3d 48, 59–60 (1st Cir.2007) ("[W]e conclude that if [the defendant] was not informed by counsel of his right to testify in his own defense, was not otherwise informed of the right by the court, and would have offered genuinely exculpatory testimony, the failure of counsel to inform [the defendant] of his right to testify would be prejudicial."); *Rega v. United States,* 263 F.3d 18, 21–26 (2d Cir.2001) (finding that even if [the defendant] was denied his right to testify as a result of counsel's deficient performance, there was no prejudice because defendant's "proposed testimony would have added little weight to his defense but would have opened the door to introduction of the [prior] conviction, followed by a less than credible explanation, and of the highly damaging audiotapes . . ."); *Gonzales v. Elo,* 233 F.3d 348, 357 (6th Cir.2000) (in challenge to effectiveness of counsel, defendant "failed to show that he was actually prejudiced by his failure to testify," where he would have testified that one of the government witnesses was not telling the truth, but there were several other corroborating witnesses); *United States v. Tavares,* 321 U.S.App. D.C. 381, 384, 100 F.3d 995, 998 (1996) (rejecting "a rule under which defense counsel's performance resulting in the denial of the defendant's right to

The question whether denial of the right to testify is to be considered structural error reversible *per se*, or "trial error" subject to harmless error review, was presented to this court in *Beckham v. United States*, 609 A.2d 1122, 1126–27 (D.C.1992).[22] There, we found it unnecessary to decide the question, however, because, applying harmless constitutional error review under *Chapman*, we held that the trial court's denial of the defendant's request to testify was not harmless beyond a reasonable doubt. *Id.* at 1127. We adopt a similar approach here because, even if we assume the error is not reversible *per se*, we conclude that, viewed in the context of appellant's trial, the error affected appellant's substantial rights. *See Olano*, 507 U.S. at 736, 113 S.Ct. 1770.

We begin our analysis by noting generally that, even when Courts disapprove application of a rule of *per se* reversal for violations of the constitutional right to testify, and reviewing for harmless error, the judicial scale tips heavily in favor of finding prejudice. This derives, at least in part, from the virtual impossibility of assessing the important "dignity interests," *Boyd*, 586 A.2d at 674, at the core of the

defendant's right "to become an active participant in the proceeding that affects his life and liberty and to inject his own action, voice and personality into the process. . . ." *Wright*, 572 F.2d at 1078. Thus, for example, in cases of preserved trial court error, "[a]s a general matter, it is only the most extraordinary of trials in which a denial of the defendant's right to testify can be said to be harmless beyond a reasonable doubt." *Martinez*, 951 F.2d at 1157. Even under *Strickland's* less demanding standard applicable to claims that counsel deprived the defendant of the right to testify—which, as we have noted, is the same standard as the third prong of the plain error analysis to determine whether the error affected substantial rights—courts also "continue to assign special significance to the defendant's precluded right to testify." *Tavares*, 321 U.S.App. D.C. at 384, 100 F.3d at 998.

We conclude that in this case there is a reasonable probability that but for the violation of appellant's right to testify, the jury would have had a reasonable doubt of his guilt. First, appellant's testimony could have resonated with the jury. Ap-

testify constitutes prejudice *per se*," and explaining that "[a] more reasonable approach, and one in keeping with *Strickland's* two-part test, is to continue to assign special significance to the defendant's precluded right to testify and at the same time to inquire whether it is reasonably probable that the defendant's testimony would have changed the outcome of the trial in his favor"); *United States v. Rantz*, 862 F.2d 808, 811 (10th Cir.1988) (noting, in a case alleging ineffective assistance of counsel, that "[b]ecause of the amount of evidence against the petitioner, this court cannot conclude that there is a reasonable probability that the result of the case would have been different had counsel permitted petitioner to testify. . . .").

22. In *Beckham*, the trial court denied the defendant's request to testify in a contempt proceeding. 609 A.2d at 1124. The judge ex-

plained that she did not need to hear the defendant's testimony or observe his demeanor as she had already had the opportunity to do so at an earlier status hearing. Defendant was cited for contempt because he had twice tested positive for using cocaine in violation of the court's order releasing him pending trial. At the status hearing, defendant denied using cocaine and explained that he must have tested positive because he was in a room where others were using cocaine. At the contempt proceeding, defense counsel pleaded with the judge to let the defendant take the stand, but the judge refused, and held defendant in contempt. We reversed, explaining that even if the defendant could not refute the government's scientific evidence that cocaine cannot enter the body by osmosis, it was error to refuse to "let [the defendant] be sworn and attempt to exculpate himself by his own words." *Id.* at 1126.

pellant would have presented a plausible narrative, admitting that he was in the alley with Investigator McClinton but explaining that he was purchasing drugs and had received the pre-recorded twenty dollar bill as change during the transaction. Appellant's testimony might have gained the jury's trust because he would have inculpated himself as a drug user and admitted to drug possession, one of the charges of which the jury convicted him. *See Beckham,* 609 A.2d at 1126 (reversing conviction where defendant's testimony was excluded because "a denial by appellant under oath that he had deliberately ingested cocaine, offered to impress the judge with its sincerity if nothing else, could not be said to be irrelevant" or harmless).

Second, the record supports that appellant had every intention to testify, as both he and defense counsel unequivocally told the judge that appellant planned to take the stand.

Third, there was little (if any) risk in appellant taking the stand. The trial judge's warning that appellant would be impeached with his prior drug distribution conviction if he chose to testify was overstated in the context of this trial. Appellant's prior drug conviction had been mentioned in the government's opening statement, admitted into evidence as part of the government's case-in-chief by stipu-

lation, was mentioned again in the government's closing argument, and made part of the court's instructions to the jury.[23] Therefore, there would have been negligible additional prejudicial information presented to the jury if the conviction was also used to impeach appellant's credibility had he taken the stand. *Cf. Rega,* 263 F.3d at 26 (concluding error was harmless because taking the stand would have led to introduction of prior conviction). Moreover, the trial judge would have been required to caution the jurors that they could not use appellant's prior drug conviction as a basis to convict him in this case, and we must presume that the jury would have followed that instruction. *See Byrd v. United States,* 614 A.2d 25, 31 (D.C.1992).[24]

Fourth, appellant's testimony was crucial to his defense, as appellant was the sole witness able to present his version of the facts surrounding the alleged drug transaction. Moreover, his failure to take the stand likely prejudiced him with the jury. Indeed, when defense counsel started to say in closing argument that appellant had received the pre-recorded bill in change for drugs he had purchased, the court sustained the prosecutor's objection that there was no evidence to support that argument. The prosecutor's comment, ratified by the court's action, would have been a stark reminder to the jury that the

**23.** Appellant's indictment was phrased in such a way that a prior conviction became an element of the crime: "On about July 23, 2002, ... Robert L. Arthur, *previously having been convicted of distribution or possession with intent to distribute ....*" (emphasis added). Thus, even though appellant had not testified, appellant's prior drug conviction was presented to the jury as part of the government's case, and the prosecutor was able to argue to the jury that the government had proven that appellant "had previously been convicted of a violation of D.C.Code, Section 904," the same offense with which he was

charged in this case. The trial court instructed the jury that an element of the crime included "that the defendant has been previously convicted of a violation of 48 D.C.Code 904.01(a)(1)."

**24.** Appellant also had two prior convictions under the Bail Reform Act. Although they also were admissible for impeachment purposes, as the trial court recognized, the BRA convictions did not have the potential for prejudice of the prior distribution conviction that had already been presented to the jury.

defense had failed to make good on the promise made in opening statement that "the facts will show" why appellant had the twenty dollar pre-recorded bill. But without appellant's testimony, there were no such facts in evidence.

Finally, the government's case, though sufficient to convict, was not free from doubt. By acquitting appellant of the second charge of possession with intent to distribute, which related to the marijuana found in the car, the jury evidently rejected aspects of the government's case. One ziplock bag of marijuana was found in the car, and when he was arrested, appellant—who was in the car with two others—was holding a paper with marijuana in his hand, as if preparing to smoke it. These facts corroborated appellant's claim that the marijuana found in his possession was for personal consumption, not for sale. The jury apparently accepted this to be true, as it acquitted appellant of intending to distribute the marijuana found in the car and convicted him only of the lesser-included offense of possession. The jury might have been similarly persuaded that, as appellant would have testified, he had gone into the alley to buy marijuana, and that Investigator McClinton mistakenly identified him as the seller. At trial, defense counsel challenged Investigator McClinton's identification of appellant as the seller based on inconsistencies between his testimony and that of Inspector Garner. Investigator McClinton testified that as he and the seller went into the alley, another man (not appellant) had been leaving the alley. But Investigator Garner, who received the lookout information from McClinton and then followed appellant until he was arrested, recalled that McClinton "advised us that the person coming *out* of the alley was the person he just bought from."[25] There were other minor inconsistencies in the officers' testimony, as well as some weaknesses in McClinton's identification. Questions about the accuracy of McClinton's identification of appellant as the seller, when combined with appellant's proposed testimony admitting that he had gone into the alley to buy drugs for his own use, which was corroborated by the fact that he was found soon after the purported transaction in the alley using marijuana in a car with two companions, could have caused a juror to have a reasonable doubt as to whether it was appellant—or someone else—who sold marijuana to Investigator McClinton.

As the Court has observed, "the most important witness for the defense in many criminal cases is the defendant himself." *Rock,* 483 U.S. at 52, 107 S.Ct. 2704. This is such a case. On this record, we are "reluctant to assume that relevant testimony by the defendant under oath, elicited 'from the point of view most favorable to him' but also tested by cross examination, [would] have no capacity to 'correct a premature misjudgment' by the trier of fact." *Beckham,* 609 A.2d at 1128 (quoting CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 1.02 (3d ed.1978)).

D. *Did the error affect the fairness, integrity or public reputation of judicial proceedings?*

██ With regard to the final prong of plain error review-the requirement that the error have either resulted in either a miscarriage of justice or seriously affected

---

**25.** Investigator McClinton testified that after he purchased the marijuana, he "gave a lookout" saying, "[t]he guy you saw going *into* the alley with me was the one doing the sale." (emphasis added). He also testified that the only other person he saw in the alley was *leaving* as he was entering; but Investigator Garner, when asked if McClinton walked into the alley with anyone other than appellant responded, "It was so—it was a guy, but I can't remember, I think it was *another buyer."* (emphasis added.).

the fairness, integrity, or public reputation of judicial proceedings-the vigor with which we have protected a defendant's right to testify necessitates but one result. In *Boyd*, in declaring that the right to testify in one's own defense is fundamental, we recognized that this right "is so inherently personal and basic that *the fundamental fairness of a criminal trial is called into question* if [it is] surrendered by anyone other than the accused, or if the accused relinquishes [it] in any manner other than by voluntary, knowing and intentional waiver." *Boyd*, 586 A.2d at 677 (quoting *Curtis*, 681 P.2d at 511) (emphasis added) (alterations in original); *see Rock*, 483 U.S. at 52, 107 S.Ct. 2704 (noting that the right to testify in one's own defense is "[e]ven more fundamental to a personal defense than the right of self-representation, which was found to be 'necessarily implied by the structure of the [Sixth] Amendment' "). Moreover, if believed by the jury, appellant's testimony would have prevented a miscarriage of justice, as appellant maintained he was innocent of the distribution charge. *See Wilson*, 785 A.2d at 326 (equating "miscarriage of justice" with "actual innocence"); *Perez v. United States*, 968 A.2d 39, 101 (D.C.2009).

For the foregoing reasons, we conclude that the trial court committed plain error when it needlessly engaged appellant in a manner that would have been perceived by a reasonable defendant facing felony drug charges as questioning his expressed intention to testify-and in this case, caused appellant to change his decision—thereby interfering with appellant's constitutionally protected right to take the stand on his own behalf.[26]

Accordingly, the judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion.[27]

*So ordered.*

---

**26.** While we hold that the trial court's actions in this case unduly influenced appellant to abandon his previously asserted decision to testify, we decline appellant's invitation to limit our reasoning in *Boyd* and adopt the view that *any* colloquy with a *testifying* defendant runs "the risk that the judge will interfere with the defendant's relationship with his lawyer" and therefore "introduces error into the proceedings." We have discussed what is appropriate judicial inquiry and what crosses the line into impermissible judicial intervention. Our decision in this case does not narrow *Boyd* in any manner; to the contrary, we strengthen *Boyd's* central holding by reaffirming that the right of a defendant to testify is a fundamental right that can only be waived by the defendant's knowing, intelligent, and voluntary waiver.

**27.** Although we reverse the conviction for distribution of marijuana, we affirm appellant's conviction of simple possession as appellant (in his effort to demonstrate that he was a marijuana buyer, not a seller) has conceded that he had purchased and was in possession of marijuana when he was arrested. Therefore, he could not satisfy the third or fourth prongs of plain error review with respect to his conviction for simple possession.