Prince Wilbert WOOLFOLK,
Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2010–SC–000331–MR.

Supreme Court of Kentucky.

April 21, 2011.

As Corrected April 27, 2011.

Steven B. Strepey, Louisville, KY, Counsel for Appellant.

Jack Conway, Attorney General, Michael John Marsch, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice VENTERS.

Appellant, Prince Wilbert Woolfolk, appeals as a matter of right, Ky. Const. § 110(2)(b), from a judgment entered upon a jury verdict by the Daviess Circuit Court convicting him of first-degree rape. Pursuant to the jury's recommendation, he was sentenced to twenty years' imprisonment.

Appellant now raises three claims: (1) that the trial court erred by discouraging him from exercising his constitutional right to testify; (2) that the trial court erred by failing to order a competency evaluation after he manifested symptoms of incompetency during the trial; and (3) that there was a violation of his right to a speedy trial because of a twenty-four year lapse of time between the crime and the bringing of the indictment.

Upon review, we conclude that the trial court did not abuse its discretion in failing to order a competency evaluation during the trial; that no speedy trial violation occurred; and though constitutional error occurred in the trial court's effort to discourage Appellant from testifying falsely, the error was harmless beyond a reasonable doubt. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Viewed most favorably to the verdict, the relevant facts are as follows. In February 1984, A.C. was a seventeen-year-old high school girl, active in her church choir. Appellant, then fifty-one years old, was the pastor at A.C.'s church in Owensboro. On the date of the crime, A.C. learned from her mother that Appellant had called to say that he would pick her up from school

and take her to the church, presumably for a church choir activity. In fact, there was no such activity at the church.

Appellant picked up A.C. and took her to his office at the church, where, according to A.C, he raped her. Confused by the fact that her mother had permitted the pastor to pick her up, A.C. went to stay with a confidante named Donna, instead of staying at home. Within a few days, fearing the rape may have impregnated her, A.C. used a coat hanger in a crude attempt to cause an abortion. As a result, she was hospitalized. Records of that hospitalization were admitted at trial. In the meantime, A.C.'s mother learned from Donna what had happened, and she confronted Appellant. Appellant denied that he raped A.C, but admitted that he had rubbed his penis between her legs in an effort to "comfort" A.C. because "she seemed so neglected." At the family's insistence, Appellant agreed to repent before the congregation, but he never did. A.C. and her family did not report the incident to the police because, according to their religious beliefs at the time, prosecuting a pastor in court was a sin.[1]

Some twenty-three years later, A.C. attempted suicide. Believing that the rape may have played a part in the attempt, and that punishing Appellant for the crime may bring relief to her daughter, A.C.'s mother contacted the police about the 1984 incident. During the investigation, Appellant admitted to police that a sexual encounter with A.C. had occurred but he denied that he used force or that penetration occurred. Later, speaking to a local newspaper reporter, he admitted "There was no rape whatsoever. . . . It was a matter of putting a penis between her legs, that's as far as it got. . . . There

---

1. "Touch not mine anointed, and do my prophets no harm." I Chronicles 16:22, and Psalms 105:15.

wasn't any compulsory [sic], it was not against her will at all.... It wasn't appropriate, but it wasn't a sin or anything like that."

On February 4, 2008, Appellant was indicted for first-degree rape. The trial began on January 26, 2010, and concluded with a jury verdict finding Appellant guilty of first-degree rape and recommending a sentence of twenty years' imprisonment.

Two of the issues presented in this appeal arose during a lunch break taken amidst A.C.'s trial testimony. Appellant and his trial counsel conferred during the break to discuss how best to cross-examine A.C. about her claim that Appellant had forcibly raped her. To counsel's surprise, and contrary to all prior statements Appellant had made on the subject, Appellant told him that he had used force against A.C., and that there had indeed been penetration.

Appellant's statement raised trial counsel's concern about his ethical obligations in cross-examining A.C. about her claims regarding force and penetration, and his ethical obligations that might arise if Appellant took the stand in his own defense and denied that force and penetration occurred. Counsel immediately contacted the Kentucky Bar Association ethics hotline for advice, and requested an *in camera* conference with the trial court. When he attempted to speak further to Appellant about the sudden revision of his story, Appellant claimed that he did not remember making the statements. Thus, Appellant appeared to have manifested a sudden loss of memory.

The trial court granted counsel's request for an *ex parte, in camera* conference.

Counsel moved the court to order a competency examination of Appellant, and to delay further proceedings pending such an examination. The trial court denied both requests. Counsel for Appellant also cautiously informed the court of Appellant's surprising admission regarding the questions of force and penetration. The trial judge advised Appellant of the possible consequences of giving inconsistent testimony should he decide to testify. Appellant now contends that the trial court improperly discouraged him from exercising his right to testify on his own behalf, and that the trial court erred in refusing to order a competency evaluation.

## II. THE TRIAL COURT'S WARNING TO APPELLANT THAT HIS ANTICIPATED TESTIMONY MIGHT RESULT IN A PERJURY CHARGE WAS ERROR. BUT WAS HARMLESS BEYOND A REASONABLE DOUBT.

 Appellant argues that he was denied his right to testify on his own behalf by the manner in which the trial court attempted to dissuade him from giving false testimony. As noted above, during the trial, Appellant's counsel requested an *ex parte* conference with the court for the purpose of discussing how Appellant's mid-trial communication to counsel, which contradicted his previous statements, as well as Appellant's alleged lapse of memory, should affect the ongoing trial.[2]

In chambers, meeting first without Appellant, counsel informed the court of his concerns about Appellant's statement during the break. The trial court and counsel mutually acknowledged that, because Ap-

---

**2.** In *Brown v. Commonwealth,* 226 S.W.3d 74 (Ky.2007), we discussed the required procedures when trial counsel in a criminal case suspects his client may intend to take the stand and testify falsely. In this case, the procedure outlined in *Brown* may have been closely, though not precisely followed. Appellant does not cite any deficiencies in that process as grounds for relief.

pellant had previously admitted to having sexual contact with A.C., the "heart of the dispute" was whether Appellant's penis had penetrated the victim and whether he used force against her, both being essential elements of the crime of rape as charged. Counsel and the trial court also appear to have concluded that Appellant's original story, in which he denied penetration and the use of force, was false and that Appellant's most recent statement, in which he apparently admitted penetration and the use of force, was true.

With that premise underlying the discussion, Appellant was then brought into chambers, where the trial court told him, *incorrectly*, that if he testified differently from what he told his attorney during the trial with respect to the issue of force and penetration, he would be committing "a serious felony," and that a "high possibility" existed the Commonwealth would prosecute him for perjury. He also told Appellant, "If you testify, [trial counsel] is not allowed to ask you questions nor is he allowed to refer to your testimony in closing argument." The court explained to Appellant that it would be "in your best interest not to testify at all" if he was going to testify falsely. The court further pointed out to Appellant that inconsistencies in his trial testimony might offend the jury, in which case he "might not see the light of day," meaning that the jury would treat him more harshly if he testified falsely. Appellant's initial response was that he did not expect to testify because he wanted his lawyer to testify for him. When informed that his attorney could not testify for him, and asked if he wanted to testify for himself, Appellant answered, "If I have to, I hope not. Whatever is the

best. I don't know." Appellant ultimately did not testify.

While it is evident that the trial court and trial counsel were making an earnest effort to deal with a delicate situation, we are troubled because the trial court's warning to Appellant, that his anticipated testimony could result in a prosecution for perjury, was incorrect. KRS 523.070 provides that "[n]o prosecution shall be brought under this chapter [Chapter 523– Perjury and Related Offenses] when the substance of the defendant's false statement is his denial of guilt in a previous criminal trial." Commentary to the statute further states, "[t]he purpose of this provision is to prevent abusive retrials of the original charge based on the defendant's denial of guilt. It does *not* grant immunity to prosecution for perjury committed by defendants during previous criminal trials. It permits prosecution for perjury on collateral or subsidiary issues, but not on the denial of guilt." [3]

Thus, assuming Appellant had chosen to testify and, as expected, maintained his original story that no force or penetration was involved, his testimony would have amounted to no more than a denial of two of the essential elements of forcible rape under KRS 510.040, and thus would have equated to a denial of guilt. His testimony would not have been in relation to "collateral or subsidiary issues." KRS 523.070 would bar a subsequent charge of perjury if, as expected, Appellant's testimony simply repeated his original denial of force and penetration. The trial court's advice to the contrary was error. The question then becomes whether this misinformation, coupled with the trial court's other re-

---

3. For example, if a criminal defendant concocts an untruthful alibi (which would exceed merely denying the charge) he would be subject to prosecution for perjury for his false testimony on this subsidiary matter.

marks, amounted to improper coercion, depriving Appellant of his right to testify.[4]

■ There is no doubt that a defendant's right to testify on his own behalf is a right firmly grounded in the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, reinforced by § 11 of the Kentucky Constitution,[5] and further assured by KRS 421.225, which states that a criminal defendant "shall be allowed to testify in his own behalf[.]" *See Quarels v. Commonwealth,* 142 S.W.3d 73, 78–79 (Ky. 2004).

■ In recognition of this right, it is improper to coerce a defendant into relinquishing his constitutional right to testify through threat of prosecution for perjury. In *Hillard v. Commonwealth,* 158 S.W.3d 758, 766 (Ky.2005), we observed that perjury warnings directed to a defense witness, when limited to mere information or advice about the possibility of a perjury charge, were not improper *per se.* But, reversal may be required if such warnings are so strongly cast that they amount to deliberate and badgering threats designed to quash significant testimony, or otherwise intimidate a witness to the extent of interfering with the witness's free and unhampered choice to testify. *See Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (holding that a trial judge's badgering of sole defense witness which included threatening him with prosecution for perjury causing him not to testify constituted reversible error); *Unit-*

*ed States v. Blackwell,* 694 F.2d 1325, 1334 (D.C.Cir.1982) ("[W]arnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify."); *Davis v. Texas,* 831 S.W.2d 426 (Tex.App.1992); H.D. Warren, Annotation, *Statements, comments, or conduct of court or counsel regarding perjury, as ground for new trial or reversal in civil action or criminal prosecution other than for perjury,* 127 A.L.R. 1385 (1940) ("Any statement by a trial court to a witness which is so severe as to put him or other witnesses present in fear of the consequences of testifying freely constitutes reversible error."). While *Webb, Blackwell,* and *Hillard* concerned intimidating a defense witness, it follows that the same reasoning would apply with even greater force if it is the defendant who is being intimidated. *See U.S. v. Davis,* 974 F.2d 182, 187 (D.C.Cir.1992) ("It seems only sensible ... that ... judicial behavior aimed at dissuading the defendant himself—not merely his witnesses—from testifying would surely offend his statutory and constitutional rights.").

■ We have no bright line test to define the point at which cautionary advice about perjury becomes an improper threat resulting in reversible error. Certainly, all of the attendant circumstances should be considered. *Hillard* should be read as requiring a substantial degree of intimidating circumstances before a simple "warn-

---

4. At the Commonwealth's request, before the defense rested its case, the trial court again discussed with Appellant his decision not to testify. During the discussion, Appellant indicated to the trial court that he talked to his attorney about his decision not to testify; that his decision not to testify was intelligently, voluntarily and knowingly made; and that his decision was not made as a result of coercion. Appellant's acknowledgement, however, was made under the mistaken belief, created by

the trial court, that he would likely be prosecuted for perjury if he took the stand and proclaimed that there had been no force or penetration. It follows that Appellant's decision was burdened with that misinformation.

5. In pertinent part, § 11 of the Kentucky Constitution states, "In all criminal prosecutions the accused has the right to be heard by himself and counsel...."

ing" against perjury will be viewed as a "badgering threat." Having viewed the record here, we agree that the tenor of the warning given by the judge was administered cautiously and judiciously. But, implicit in that calculus is the assumption that, on its face, the warning is valid advice—that a subsequent perjury charge *is* a distinct legal possibility. However, when the warning or threat of future prosecution for perjury is false, it cannot be construed as having any legitimate purpose. We find it difficult to conceive that the inaccurate warning, whether in good faith or otherwise, can have any useful effect *except* to dissuade a defendant from exercising his right to testify. Thus, we conclude that, despite the absence of other intimidating factors, the trial court's inaccurate warning to a criminal defendant that a perjury charge is a likely consequence of his election to testify, when in fact it is not, is always error.

 Having determined that the trial court's warning to Appellant was error, we review further to determine if it is error that requires reversal. It is fundamental that "no error or defect in any ruling ... or in anything done or omitted by the court ... is ground for granting a new trial or for setting aside a verdict ... unless it appears to the court that the denial of such relief would be inconsistent with substantial justice." RCr 9.24. Moreover, we "must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."

*Id.* "Virtually all errors, therefore, are subject to harmless error analysis." *Crossland v. Commonwealth,* 291 S.W.3d 223, 231 (Ky.2009). The exception to this general principle is structural error, that is, errors "which are, *per se,* reversible because they undermine the fundamental legitimacy of the judicial process." *Id.* at 232. "In such cases, the error 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" *Washington v. Recuenco,* 548 U.S. 212, 219, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (citation and footnote omitted).[6]

While the right to testify is unquestionably an important constitutional right, nevertheless, the erroneous denial of the right has been held not to be structural error. For example, although under differing factual circumstances, harmless error review under the constitutional standard has been applied to denial of the right in the following cases: *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir.1991) (Applying constitutional harmless error analysis to denial of right to testify but noting "it is only the most extraordinary of trials in which a denial of the defendant's right to testify can be said to be harmless beyond a reasonable doubt."); *Ortega v. O'Leary,* 843 F.2d 258, 260–63 (7th Cir.1988) (applying constitutional harmless error review to denial of defendant's right to testify); *Alicea v. Gagnon,* 675 F.2d 913, 925 (7th Cir.1982) (per curiam) (harmless error found where defendant was precluded from giving alibi testimony due to violation of Wisconsin

---

**6.** Among those types of errors which have been found to be structural are: *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge); *See also Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (coerced confession).

notice of alibi statute); *Wright v. Estelle,* 572 F.2d 1071 (5th Cir.1978) (*en banc*) (Even if defendant had been deprived of claimed personal constitutional right to testify on his own behalf when his attorney refused to let him testify in homicide prosecution, any error was harmless beyond reasonable doubt, since defendant's testimony would not have altered verdict based on evidence which overwhelmingly connected defendant to the crime.); *Agosto v. State,* 288 S.W.3d 113 (Tex.App.2009) (The right to testify is "fundamental" in the sense that the defendant possesses the ultimate authority on whether to invoke the right, however the denial of the right to testify is a trial error, rather than a structural error, which is subject to a harm analysis.) As a point of clarification, we add the result may be different if (unlike here) it is the government that induces the denial of testimony thorough improper conduct. *See, e.g. U.S. v. Morrison,* 535 F.2d 223, 228 (C.A.Pa.1976) (Where the government has prevented the defendant's witness from testifying freely before the jury, it cannot be held that the jury would not have believed the testimony or that the error is harmless).

■ We recognize the great importance of a defendant's right to testify on his own behalf. "In fact, the most important witness for the defense in many criminal cases is the defendant himself.... A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness." *Rock v. Arkansas,* 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). However, in the absence of pertinent authority that denial of a criminal defen-

dant's right to testify is structural error, we will follow the general principle as stated above, and treat such denial as subject to harmless error analysis.

■ Nevertheless, as discussed, the error is of constitutional significance. While constitutional error is subject to the harmless error analysis, review is under the heightened standard as stated in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "That test ... is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.; see also Winstead v. Commonwealth,* 283 S.W.3d 678, 689 n. 1 (Ky.2009).

Our analysis begins with the observation that, unlike the witnesses in *Webb, Blackwell,* and *Hillard,* it is not claimed that Appellant would have testified but for the erroneous perjury warning from the judge. Appellant has never claimed that he had decided to testify at his trial or that the trial judge talked him out of testifying. His conversation with the Court arose early in the trial, well before such a decision was required. At that time, Appellant expressed a preference not to testify unless he had to. He argues only that the trial court should have more fully "explored" with him the option and consequences of testifying. In this context, the question for harmless error analysis becomes, not whether the absence of Appellant's testimony "contributed to the verdict obtained" or whether his testimony may have changed the outcome of the trial.[7] Rather, the question is whether, absent the trial court's erroneous advice, Appellant would have chosen to exercise his right to testify on his own behalf. If, beyond a reasonable

---

**7.** Appellant has provided us with no indication of what he would have said had he elected to testify. We can only presume that his testimony would have been consistent with his pre-trial statement to the newspaper re-

porter and to the police. Therefore, we cannot determine, and we need not determine, if such testimony would have changed the verdict.

doubt, the misleading information did not cause Appellant's decision not to testify, then it did not contribute to the verdict, and was therefore harmless under the standard of review for constitutional error.

We first consider the factors raising doubt that the error was harmless. A.C. presented emotional testimony concerning the 1984 events, alleging both force and penetration. Evidence concerning her naïve abortion attempt a few days after the incident, and the resulting medical treatment that tended to corroborate her version of events, arguably lend sympathy to her cause. Those factors would have, for Appellant and his trial counsel, weighed in favor of testifying to rebut her claim. Furthermore, based upon our viewing of the trial proceedings, Appellant presents himself as distinguished and well-spoken. As a long-time pastor, presumably he is a polished and capable public speaker, with a corresponding ability to communicate well. For these reasons, as a general matter, it appears he may have made a good impression from the witness stand. This would be of particular importance in this case, because upon the issues of force and penetration, it is ultimately a he-said-she-said case.

On the other hand, through his prior statements to the newspaper reporter and to the police, the jury heard Appellant's denial of the rape charge, and his trial counsel emphasized that point in the closing argument. By declining to testify, Appellant's trial counsel was able to exploit the weaknesses in the prosecution's case [8] without exposing Appellant to what, in all likelihood, would have been a very aggressive cross-examination. Undoubtedly, cross-examination would have underscored a sordid version of events forcing him to repeat how a fifty-one year old pastor, under false pretenses, picked up a seventeen-year old female parishioner from school, took her to his church office, and persuaded her into a willing sexual encounter in which he placed his penis between her legs but did not penetrate her. As so described, and while the jury was otherwise made aware of this version of events, an immediate impression registers that Appellant's own testimony to this effect could be so inflammatory as to overshadow his denial of force and penetration; indeed, a juror could reasonably view this as a shocking betrayal of the pastor-parishioner relationship between a married pastor and a minor parishioner and a transgression as offensive as the criminal charge itself. Moreover, if Appellant's testimony under cross-examination strayed too far beyond the confines of his prior admissions, he could easily expose himself to proper perjury charges, thus validating the trial court's earlier admonition. We have also noted that in his opening statements to the jury, defense counsel for Appellant did not indicate that Appellant would testify and during his *voir dire* examination of the jury, he reminded them that a decision not to testify could not be held against a criminal defendant.

Given the entirety of the circumstances as outlined above, we believe it is highly improbable that competent defense counsel would have advised his client to testify, and correspondingly, highly improbable that a well-advised defendant would have elected to present Appellant's testimony. We are also influenced, as noted above, by the absence of any claim, even now, that

---

**8.** These weaknesses included the fact that the crime itself was twenty-six years in the past at the time of the trial, that it was not reported to police for more than two decades, that A.C. was suffering from emotional problems when the alleged rape was reported to police, that very little physical evidence existed to corroborate A.C.'s claim, and that A.C. had consulted an attorney about suing the church.

Appellant was dissuaded from taking the stand because of the judge's comments. It is within this context that we conclude beyond a reasonable doubt that the trial court's inaccurate advice to Appellant did not induce his decision not to testify or otherwise contribute to the verdict obtained. We do not find that the trial court's erroneous perjury warning provides a basis for reversal of his conviction.

## III. APPELLANT WAS NOT ENTITLED TO A COMPETENCY EVALUATION

■ Appellant next contends that the trial court erred by failing to continue the trial and order a competency evaluation and hearing after he manifested symptoms of incompetency midway through the trial. Instead, the trial court proceeded with the trial.

Appellant's claim that he was entitled to a competency evaluation is based upon the manifestation of sudden memory loss that occurred when he was unable to recall the significant admission he had made to trial counsel only moments before. Appellant also told trial counsel, for the first time, that there was a history of dementia in his family, and that his doctor told him that he was suffering early symptoms of the disease. Based upon these developments, trial counsel raised concern that Appellant may be incompetent to be tried.

Trial counsel related these events during the *in camera* meeting with the trial court, stating that his client was suffering from a lack of memory, was disoriented, and may be suffering the onset of dementia. Trial counsel told the court that he did not believe his client was trying to be manipulative, but rather actually seemed to have forgotten part of what they had just discussed. Appellant was then brought into chambers for the discussion with the trial court as described in the preceding section of this opinion.

After concluding the discussion relevant to Appellant's decision to testify, the trial court brought the prosecutor into chambers for discussion of the competency issue. The Commonwealth objected to Appellant's motion for a continuance pending a competency examination. The Commonwealth argued that there had been a previous continuance, that no prior concerns relating to Appellant's competency had been raised, and that Appellant was engaging in a ploy to delay the proceedings based upon A.C.'s emotional testimony that morning.

In denying Appellant's motion for a continuance for a competency evaluation, the trial court noted that many defendants exhibit confusion around the time of trial as a result of stress and fear. The trial court stated that those defendants understand the proceedings, but do not want to confront the consequences of their acts. The court found that because Appellant had actively participated in his defense and that this was the first time the issue of competency was raised, he had not met the standard to continue the trial for a competency evaluation.

■ KRS 504.100(1) provides as follows: "If upon arraignment, or during any stage of the proceedings, the court has reasonable grounds to believe the defendant is incompetent to stand trial, the court shall appoint at least one (1) psychologist or psychiatrist to examine, treat and report on the defendant's mental condition." In addition, the United States Constitution, as a matter of due process, bars trying a defendant who is incompetent to stand trial. *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

■ In *Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321

(1993), the United States Supreme Court held that a defendant is competent if he can "consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." The Court noted that a competent defendant is one who is able to make a "reasoned choice" among the alternatives available to him when confronted with such crucial questions as whether he should testify, waive his right to a jury trial, cross-examine witnesses, or put on a defense. *Id.* at 397–98, 113 S.Ct. 2680; *Bishop v. Caudill,* 118 S.W.3d 159, 162–63 (Ky.2003). "Evidence of a defendant's irrational behavior, his demeanor in court, and any prior medical opinion on competence to stand trial are all relevant facts for a court to consider" in reaching its decision. *Mills v. Commonwealth,* 996 S.W.2d 473, 486 (Ky.1999).

As further explained by Professors Fortune and Lawson in *Kentucky Criminal Law,* § 5–4(b) (Lexis 1998):

> The focus in these determinations is on the defendant's mental condition at the time of the proceeding (not at the time of the criminal act). The following statement describes the nature of the inquiry:
>
> 'Under this test, there are two distinct matters to be determined:
>
>> (1) whether the defendant is sufficiently coherent to provide his counsel with information necessary or relevant to constructing a defense; and
>>
>> (2) whether he is able to comprehend the significance of the trial and his relation to it. The defendant must have an 'ability to confer intelligently, to testify coherently, and to follow the evidence presented.' It is necessary that the defendant have a rational as well as a factual understanding of the proceedings.'

Would defendant recognize false testimony by a witness and would he know to advise counsel of that fact? Does he understand the roles of trial participants (i.e. that the prosecutor is his adversary, that the judge decides his fate, that his counsel acts in his best interest, etc.)? Does he understand that convictions will result in sanctions? The inquiry is a factual one that necessarily depends upon the peculiar facts and circumstances of the case.

*See Bishop,* 118 S.W.3d at 163.

■■■■ We recently discussed the scope of a defendant's entitlement to a competency hearing in *Padgett v. Commonwealth,* 312 S.W.3d 336 (Ky.2010), wherein we noted that, when analyzing whether a defendant is competent to stand trial, two separate interests—a statutory right under KRS 504.100(1) and a constitutional right under the Fourteenth Amendment of the United States Constitution—are at stake. More importantly, we noted in *Padgett* that different standards govern those interests. Due process under the Fourteenth Amendment requires that where substantial evidence that a defendant is not competent exists, the trial court is required to conduct an evidentiary hearing on the defendant's competence to stand trial. *Id.* at 347. In contrast, under KRS 504.100, "reasonable grounds to believe the defendant is incompetent to stand trial" mandates a competency examination, followed by a competency hearing. *Padgett,* 312 S.W.3d at 344. Thus, while the failure to conduct a competency hearing implicates constitutional protections only when "substantial evidence" of incompetence exists, mere "reasonable grounds" to believe the defendant is incompetent implicates the statutory right to an examination and hearing. *Id.*

The standard of appellate review of a trial court's competency decision is "[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Turner v. Commonwealth*, 153 S.W.3d 823, 832 (Ky.2005) (quoting *Thompson v. Commonwealth*, 56 S.W.3d 406, 408 (Ky.2001)). It is within the trial court's sound discretion to determine whether "reasonable grounds" exist to question competency, though once such grounds do exist, a competency hearing is mandatory. *Gray v. Commonwealth*, 233 S.W.3d 715, 718 (Ky. 2007).

Upon review, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for a competency evaluation.

Appellant was originally indicted in February 2008, and from then until the commencement of the trial almost two years later, there were no allegations or indications that he was incompetent to stand trial. Nor did Appellant raise his family's alleged history of dementia or his alleged diagnosis of onset of the disease. The trial then commenced, again without any indication of Appellant's incompetency.

Only after A.C. presented her emotional testimony describing the February 1984 event did the issue of incompetency arise. At that juncture, it fell to the trial court to evaluate the possible explanations for Appellant's apparent sudden manifestations of disorientation and memory loss: (1) malingering; (2) a temporary reaction brought about by the shock of the victim's testimony; or (3) a genuine onset of potential incompetency.

As is usually the case, the trial court was in the best position to observe Appellant's conduct and demeanor from the outset of the proceedings, and to evaluate the circumstances, including Appellant's demeanor and deportment, occurring during the course of the trial. Therefore, its evaluation of the significance of Appellant's manifestation of disorientation and memory loss is entitled to substantial deference. In the trial court's estimation, Appellant's symptoms of disorientation and memory loss were due to the emotional testimony of the victim accusing him, her former pastor, of forcibly raping her. This conclusion was well within the bounds of reasonableness. As such, in consideration of the trial court's superior position to evaluate whether there were reasonable grounds to believe that Appellant was competent, and because its conclusion is, under the totality of circumstances, a reasonable conclusion, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for a continuance and competency evaluation.

## IV. NO SPEEDY TRIAL VIOLATION OCCURRED

Appellant's final argument is that he was entitled to dismissal of the charges on the basis of a violation of his constitutional right to a speedy trial. Significantly, Appellant's argument is premised entirely upon the delay between the February 1984 incident and the 2008 indictment. He makes no argument relating to the time lapse between his indictment and commencement of trial. We accordingly will limit our review to the pre-indictment delay in bringing the charges.

There is no statute of limitations for prosecution of a felony offense in Kentucky. KRS 500.050(1); *Reed v. Commonwealth*, 738 S.W.2d 818, 820 (Ky.1987). Nor is the constitutional right to a speedy trial implicated in this case, U.S. Const. Amend. VI, Ky. Const. § 11, because Appellant was not under indictment during

the period from February 1984 to February 2008. *Kirk v. Commonwealth,* 6 S.W.3d 823, 826 (Ky.1999). Prior to indictment, the speedy trial guarantee is not applicable because "with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending." *Id.* Nevertheless, unjustified and prejudicial pre-indictment delay may constitute a violation of due process and require dismissal. Prejudice alone, however, will not suffice. "[T]he due process inquiry must consider the reasons for the delay as well as the prejudice to the accused. Thus, dismissal is required only where there is both substantial prejudice and an intentional delay to gain tactical advantage." *Id.* (citations and quotation marks omitted).

Appellant argues that he was prejudiced by the delay prior to his indictment because by the time this matter was prosecuted, hospital and school records that could have assisted the defendant and disprove the allegations of the prosecuting witness were lost or destroyed. He maintains that there "is not any way to calculate how the defendant would have been assisted by timely prosecution including but not limited to the gathering of witnesses and documents."

While Appellant's allegation of prejudice is clearly speculative, nevertheless even if it is assumed that substantial prejudice resulted from the twenty-four year delay, Appellant does not allege, and there is no evidence, that the Commonwealth intentionally delayed the prosecution in order to gain a tactical advantage. It is undisputed that the Commonwealth did not learn of the incident until over two decades after the fact, and then timely investigated the case. There being no intentional delay by the Commonwealth in order to gain a tactical advantage, it follows that there was no

violation of Appellant's due process rights as a result of the pre-indictment delay.

## V. CONCLUSION

For the foregoing reasons, the judgment of the Daviess Circuit Court is affirmed.

MINTON, C.J., ABRAMSON, CUNNINGHAM and SCHRODER, JJ., concur. NOBLE, J., dissents by separate opinion, in which SCOTT, J., joins.

NOBLE, J., Dissenting:

The majority holds that improperly dissuading Appellant from testifying in his own criminal defense—effecting a deprivation of his constitutional right—is harmless because, in the majority's opinion, Appellant would not have testified anyway. After careful review of the tape of the hearing, I find that an appellate court can only speculate about the harmlessness of the misadvice. *Before* Appellant was asked on the record if he planned to take the stand, he was told that he would be subject to a perjury charge, and it was at least implied that the charge would be forthcoming if he testified any differently than what he allegedly told his attorney that day. The record does not make clear exactly what he was supposed to have said, but contextually, we can assume it was an admission of force to his counsel. However, Appellant professed no memory of saying any such thing to his attorney, and given the vagueness of the attorney's comments, it is impossible to know what the attorney heard, versus what he thought he heard.

Also, it is apparently true that up to that point in the judge's chambers, the Appellant *was* asserting his right to testify. At least that is what the attorney told the judge, when he explained why he asked for the ex parte hearing. So Appellant *did* state his desire to take the stand, and only denied any desire to do so after he had been told that he would likely be prosecut-

ed for perjury if he testified. It is beyond serious question that the misadvice influenced him to forgo his right to testify in his own defense.

But the relevant question is whether this undue influence caused him any prejudice. There is no doubt the trial court was well intentioned, and it is easy to see the mistake when the advice would be true regarding any other *witness*. Nonetheless, I am convinced that this error was prejudicial here, almost in a de facto way.

In finding that a reasonable person in Appellant's shoes would not testify, it resorts to speculation that no jury would believe Appellant because he admitted to engaging in certain types of purportedly "immoral" sexual behavior, despite the fact that such behavior is perfectly legal in this Commonwealth. The only burden of proof on this matter rests with the Commonwealth, and that burden was impermissibly lightened when the Appellant was dissuaded from testifying in his own behalf.

The majority correctly recognizes that a deprivation of one's right to testify is a constitutional error, but not a structural one, which is reviewable under the harmless error rule. This approach is consistent with this Court's treatment of the deprivation of one's right to testify in *Quarels v. Commonwealth,* 142 S.W.3d 73 (Ky.2004). "[D]enial of a defendant's right to testify on his or her own behalf is a constitutional 'trial-type' error that is amenable to the harmless error analysis espoused in *Chapman.*" *Id.* at 82. Thus, the error in this case is subject to review for harmlessness, but only under the heightened standard applicable to constitutional errors laid out in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under the heightened standard, constitutional error can be deemed harmless only where it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. 824. The majority finds such harmlessness by concluding beyond a reasonable doubt, that Appellant would not have testified even without any misinformation from the bench. The *facts* don't support such a conclusion.

To prove beyond a reasonable doubt that a defendant was not going to testify in the first place is quite a steep burden indeed.

The majority's direct evidence that Appellant would not have testified anyway is, primarily, that he never said he was going to. It is true that he does not say so on the record, but apparently he had been planning to testify: his attorney said he did and used that as the basis for obtaining the ex parte hearing with the judge. It is immaterial that his opening statement did not hint that he would testify or that his attorney questioned the jurors about whether they could be fair if he did not testify. This occurs in practically every criminal trial. Regardless, Appellant does not have to prove he was going to testify; the Commonwealth has to prove he was not. A defendant is not required to affirmatively assert his right to testify, as one is encouraged to do under the Speedy Trial Clause, for example. Thus, nothing can be inferred from any silence by Appellant on his plan to testify or not.

The majority points out that Appellant was not in fact entirely silent as to his plans to testify. The majority states, "Appellant expressed a preference not to testify unless he had to." This declaration by Appellant might carry some weight, if it had not come *immediately after* the improper perjury threat underlying this entire issue. Due to this sequencing, Appellant's comment does nothing to support the Commonwealth and the majority's claim that he wasn't going to

testify *prior* to the misinformation about perjury. On the contrary, given that Appellant's announcement appears to have come as a surprise to his counsel who joined him in chambers, it indicates that the court's immediately prior warning of perjury is exactly what changed his mind into not testifying. If anything, this episode demonstrates that the error was harmful, not harmless.

The majority concedes that there is much to indicate that Appellant would actually have been a credible witness:

> [B]ased upon our viewing of the proceedings, Appellant presents himself as distinguished and well-spoken. And as a long-time pastor, presumably he is a polished and capable public speaker, with a corresponding ability to communicate well. For these reasons, as a general matter, it appears he may have made a good impression from the witness stand.

Notwithstanding the majority's favorable impression of Appellant's general demeanor and background, it views one fact as the ultimate trump to his credibility: that he admits to sexual relations, albeit consensual, at the age of 51 with a then sixteen-year-old A.C. In the majority's opinion, Appellant's admission of such a consensual act with a sixteen-year-old "would be so damaging to his character, and so inflammatory, so as to overshadow his denial of force and penetration."

I do agree with the majority there are some acts that are so repulsive to society at large that they may inherently reflect negatively on a person's character, so as to undermine his credibility on the stand. However, it is not the place of this Court to overstep the bounds of the legislature—that body elected to make laws governing behavior in this Commonwealth—to announce our own flavor of morality. "Our Legislature has a broad discretion to determine for itself what is harmful to … morals" and we should "try to refrain from usurping its prerogative." *Walters v. Bindner*, 435 S.W.2d 464, 467 (Ky.1968). Laws "represent[ ] the collective expression of moral aspirations." *Zablocki v. Redhail*, 434 U.S. 374, 399, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Thus, they provide the only legitimate insight into what behavior the public, including members of a jury, would likely consider immoral and consequently, detract from a witness's credibility through our penal code.

The fact that the conduct at issue is not illegal if consensual highlights how important it is for a defendant to have the ability to state his version of events. If the Appellant is not entitled to this, then in the next he-said-she-said trial, why not just give the case to the jury after the Commonwealth closes? That is essentially what happened here. I cannot differentiate between this defendant and the next criminal case with a similar situation.

The question is not whether a reasonable juror *could* have disbelieved Appellant—due to his admitted conduct or any other reason. Instead, the question is whether this Court can be sure beyond a reasonable doubt that a juror *would* have disbelieved Appellant. *See Chapman*, 386 U.S. at 24, 87 S.Ct. 824. Especially given that the character flaw alleged by the majority encompasses completely legal behavior, a reasonable juror could recognize such behavior as reprehensible, but not illegal, and accept Appellant's story.

In fact, Kentucky law has always recognized, in an integrally linked context, that only those past behaviors that are criminal should undermine a witness's credibility. That context is evidence law, which permits impeachment of a witness's character only through evidence of prior *criminal* acts and, even then, only where those crimes are felonies. *See* KRE 609. A

witness may also be cross-examined on non-criminal acts, but only those acts directly "concerning the witness' character for truthfulness or untruthfulness." KRE 608(b).

A consensual sexual act with a sixteen-year-old does not qualify under either category. It is not criminal, as discussed above. Nor does it directly pertain to character for truthfulness or untruthfulness. Even "sexual *misconduct* involving minors is not probative of untruthfulness because it does not necessarily involve dishonesty or false statements." *United States v. Quiles,* Crim. A. No. 07–391–01, 2009 WL 466283, 2009 U.S. Dist. LEXIS 18995 (E.D.Pa. Feb. 24, 2009), *aff'd,* 618 F.3d 383 (3d Cir.2010) (emphasis added); *Knox v. City of Monroe,* CIV. A. 07–606, 2009 WL 936965, 2009 U.S. Dist. LEXIS 29454 (W.D.La. Apr. 6, 2009) (same).

These rules of evidence serve to prevent a jury from using past sexual conduct—or misconduct—to evaluate a witness's credibility. This bar reflects a determination in the law that such conduct has no legally cognizable bearing on a witness's truthfulness. Not only would it be reasonable for the jury to disregard consensual relations between Appellant and A.C. in evaluating his truthfulness, it would be mandatory for the jury to ignore them.

I do not doubt the majority's intention to adhere to sound legal principles in assessing Appellant's credibility in looking at the question of harmlessness. This should have been a prototypical he-said-she-said case, with the jury free to choose either side or, alternatively, to believe neither beyond a reasonable doubt and hence acquit. Instead, there was no "he said," because the defendant was improperly pressured into not testifying. Thus, the jury was left only with what "she said" and, to no surprise, believed such uncon-

tradicted testimony. I cannot deem this harmless.

SCOTT, J., joins.

### ORDER

The Opinion of the Court rendered April 21, 2011, is corrected on its face by substitution of the attached page 1 in lieu of page 1 of the original opinion. Said correction does not affect the holding of the original Opinion of the Court.