Submitted March 16, reversed and remanded May 13, 2015

Fabiola Cerpas LOZANO,
*Petitioner,*

*v.*

Artemio Castillo AGUSTIN,
aka Artemio Castillo-Agustin,
*Respondent.*

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ARTEMIO CASTILLO AGUSTIN,
aka Artemio Castillo-Agustin,
*Defendant-Appellant.*

Washington County Circuit Court
C130814RO; A154753

350 P3d 482

Peter Gartlan, Chief Defender, and Elizabeth Daily, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Pamela J. Walsh, Senior Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

LAGESEN, J.

**LAGESEN, J.**

In this appeal from a judgment of punitive contempt for violation of a Family Abuse Prevention Act (FAPA) restraining order, we are asked to decide whether the trial court's remarks to defendant about the risks of testifying were so impermissibly coercive as to violate defendant's right to testify under Article I, section 11, of the Oregon Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.[1] We conclude that the trial court's advice—which would have communicated to a reasonable person in defendant's position that the trial court would sentence defendant more harshly if defendant elected to testify—crossed the line from permissible warnings to

---

[1] Although we have held that "[a] criminal contempt proceeding is not a criminal prosecution within the meaning of [Article I, section 11 of] the constitution," *Bachman v. Bachman*, 171 Or App 665, 674, 16 P3d 1185 (2000) (citing *Pyle and Pyle*, 111 Or App 184, 186, 826 P2d 640 (1992)), generally the Oregon legislature has made the protections of Article I, section 11, applicable to punitive contempt proceedings, except for the jury trial right: "Except for the right to a jury trial, the defendant is entitled to the constitutional and statutory protections, including the right to appointed counsel, that a defendant would be entitled to in a criminal proceeding in which the fine or term of imprisonment that could be imposed is equivalent to the punitive sanctions sought in the contempt proceeding." ORS 33.065(6); *see also State v. Copeland*, 353 Or 816, 819 n 1, 306 P3d 610 (2013) (observing that, under ORS 33.065(6), "[d]efendants in punitive contempt proceedings are generally entitled to the same constitutional protections afforded defendants in criminal proceedings, except for the right to a jury trial").

The United States Supreme Court long has held that the criminal procedural rights in the Sixth and Fourteenth Amendments apply directly to proceedings for "criminal contempt," that is, contempt proceedings in which the sanctions are punitive in nature. *See generally Mine Workers v. Bagwell*, 512 US 821, 114 S Ct 2552, 129 L Ed 2d 642 (1994) (discussing difference between civil contempt and criminal contempt). The Court has explained:

"'Criminal contempt is a crime in the ordinary sense,' *Bloom v. Illinois*, 391 US 194, 201[, 88 S Ct 1477, 20 L Ed 2d 522] (1968), and 'criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings,' *Hicks v. Feiock*, 485 US 624, 632[, 108 S Ct 1423, 99 L Ed 2d 721] (1988). See *In re Bradley*, 318 US 50[, 63 S Ct 470, 87 L Ed 608] (1943) (double jeopardy); *Cooke v. United States*, 267 US 517, 537[, 45 S Ct 390, 69 L Ed 767] (1925) (rights to notice of charges, assistance of counsel, summary process, and to present a defense); *Gompers v. Bucks Stove & Range Co.*, 221 US 418, 444[, 31 S Ct 492, 55 L Ed 797] (1911) (privilege against self-incrimination, right to proof beyond a reasonable doubt). For 'serious' criminal contempts involving imprisonment of more than six months, these protections include the right to jury trial. *Bloom*, 391 US at 199, see also *Taylor v. Hayes*, 418 US 488, 495[, 94 S Ct 2697, 41 L Ed 2d 897] (1974)."

*Bagwell*, 512 US at 826-27.

impermissible coercion, violating defendant's right under the Fourteenth Amendment. Accordingly, we reverse.

L, defendant's longtime domestic partner and the mother of his children, obtained a FAPA restraining order against defendant. The restraining order awarded temporary custody of the couple's four children to L, but provided defendant with parenting time three days a week, allowing defendant to go to the curb at L's residence on those days to pick up and return the children. Otherwise, the order prohibited defendant from, among other things, "intimidating, molesting, interfering with or menacing" L and the couple's children (or attempting to do so); being within 100 yards of L's residence or workplace; "knowingly be[ing] or stay[ing] within *** 100 yards" of L; and "[c]ontacting, or attempting to contact, [L] by telephone, including cell phone or text messaging directly or through third parties." At the top of the order, a box entitled "NOTICE TO RESPONDENT" explained that the recipient of the order "must obey all of the provisions of this Restraining Order, even if the Petitioner contacts you or gives you permission to contact him/her."

Washington County Sheriff's Corporal Clifford Lascink served the order on defendant. Although defendant's primary language is Spanish, and defendant cannot read English, the order was written in English. Lascink explained, in English, "certain parts" of the order to defendant, "including that he couldn't be within 100 yards of the victim" and the portions of the order discussing parenting time. Lascink also discussed "the work aspect of it, and the no contact by third parties and the cell phone *** [a]nd also not being allowed by the residence." Lascink was aware that defendant could not read the restraining order and told defendant "that basically he could go to the courthouse." Lascink also told defendant that it was defendant's responsibility to know the contents of the order. Defendant told Lascink that he had friends who could translate it for him.

A few months after Lascink served the order on defendant, L was stopped for a traffic violation. L called defendant and "told him I got pulled over and if he could, you know, just swing by." Upon receiving L's phone call,

defendant drove to L's location to provide her with assistance, but was unable to assist her "[b]ecause as soon as he got out of the car, the officers asked him for his name, and that's how that went about."

Based on that set of events, the state filed a "Complaint for Imposition of Punitive Sanctions Contempt Violation of Restraining Order" against defendant. The complaint alleged two counts of punitive contempt under ORS 33.015 and ORS 33.065:

"Count 1

"The defendant, on or about June 7, 2013, in Washington County, Oregon, did unlawfully and willfully disobey an order of the Washington County Circuit Court, by entering or staying within 100 yards of [L].

"Count 2

"The defendant, on or about June 7, 2013, in Washington County, Oregon did unlawfully and willfully disobey an order of the Washington County Circuit Court, by contacting [L] by telephone."

The state sought the imposition of punitive sanctions in connection with the alleged violations, including a term of incarceration not to exceed six months, a fine, probation, and community service.

At trial, the parties stipulated that, on June 7, 2013, [L] "was stopped for a traffic violation, called the defendant, the defendant showed up and they had personal contact at that point." The prosecutor explained that the primary issue was "about the content of the restraining order and knowing what was in [it]" and "whether [defendant] understood that he was not allowed to have [the] contact" that occurred on that date. The state then called Lascink and L to testify in support of its case. Both Lascink and L acknowledged that defendant could not read English. Lascink testified that he "didn't remember having any problems understanding" defendant's spoken English, although L stated that she and defendant communicated primarily in Spanish, and that she spoke "Spanglish" to defendant. Lascink described the conversation that he had with defendant at the time Lascink served the order. L described calling defendant on the date

that she was stopped for a traffic violation and seeing defendant come to the scene. L further testified that, at the time that L made the call to defendant, defendant knew about the restraining order, that the two "were not supposed to be together," and that the two were not supposed to be talking to each other on the phone.

After the state rested, defendant's lawyer called defendant to the stand. Before defendant could take the stand, the following colloquy occurred:

"THE COURT:   Let's see. Having proven several violations, his girlfriend, who's very credible, has no reason to lie, has said he understood the restraining order. The officer said he understood the restraining order. And he can get on the stand and lie, and we might have a different result than if he doesn't get on the stand and lie.

"[DEFENSE COUNSEL]:   I don't anticipate his lying, Your Honor.

"THE COURT:   That's fine.

"[DEFENSE COUNSEL]:   I'm just taking,—

"THE COURT:   I should put it this way. If a middle class person with 35 years of legal experience thinks he's lying, you may have a different result than if he exercises his right to remain silent. And that's true in most cases in America, on most dates. Now he has an ICE hold, so I'm going to hold him."

Following that exchange, defendant's lawyer conferred with defendant and then informed the court that the defense would rest. When asked if she wished to make an argument, defendant's lawyer responded, "Your Honor, you heard the facts." The court immediately found defendant "in contempt with each count" and sanctioned defendant with one day of jail on the first count. The court suspended imposition of sanction on the second count and placed defendant on bench probation for one year.

On appeal, defendant argues that the colloquy delivered by the trial court violated defendant's rights under Article I, section 11, of the Oregon Constitution, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. In particular, defendant asserts that

the trial court's remarks regarding the likely outcome if defendant had testified effectively drove defendant from the stand, depriving him of the right to testify. Defendant acknowledges that he did not object to the trial court's colloquy or otherwise preserve the assigned error, but asserts that we should review the error as "plain error" or, in the alternative, excuse defendant from the requirements of preservation in this case. In response, the state argues that any error by the trial court is not "plain" and that, even if it is, we should not exercise our discretion to correct it.

Even assuming that defendant was required to preserve the assigned error, we agree with him that the trial court's remarks amounted to plain legal error in the light of the Supreme Court's holding in *Webb v. Texas*, 409 US 95, 98, 93 S Ct 351, 34 L Ed 2d 330 (1972), that the Fourteenth Amendment prohibits a trial court from administering overly coercive warnings regarding the risks of testifying falsely.[2] *State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990) (setting out the requirements for error apparent on the record). The compulsory process clause of the Sixth Amendment secures to a criminal defendant the right to call himself or herself to the witness stand to testify in his or her own defense: "Logically included in the accused's right to call witnesses whose testimony is material and favorable to his defense * * * is a right to testify himself, should he decide

---

[2] As defendant acknowledges, to date, neither the Oregon Supreme Court nor we have addressed the extent to which Article I, section 11, limits the advice a trial court can give about the risks of testifying falsely. For that reason, we are unable to conclude that the trial court's remarks amounted to *plain* error under the Oregon Constitution, and we turn to the federal constitutional standards which have long been plain. Although we ordinarily have an obligation to resolve state constitutional issues before federal constitutional issues under Oregon's "first things first" doctrine, it is an open question whether and to what extent that doctrine supplants our ordinary process for reviewing unpreserved claims of error in cases involving constitutional questions. *State v. Velykoretskykh*, 268 Or App 706, 707 n 2, 343 P3d 272 (2015). As we noted recently, "[r]esolving that question * * * should await either a Supreme Court decision or a situation in which the outcome of the state constitutional claim would be more beneficial to the claimant than the outcome under the federal claim." *Id.* Here, defendant does not suggest that Article I, section 11, would provide a more beneficial outcome to him than would the federal constitution; instead, defendant expressly urges us to implement Article I, section 11, by looking to the federal standard. Accordingly, as we did in *Velykoretskykh*, we address defendant's federal claim without resolving whether Article I, section 11, affords defendant the same protection afforded by the federal constitution.

it is in his favor to do so." *Rock v. Arkansas*, 483 US 44, 52, 107 S Ct 2704, 97 L Ed 2d 37 (1987) (internal citation and quotation marks omitted).[3] As the Court has observed, "the most important witness for the defense in many criminal cases is the defendant himself." *Id.*

Since at least 1972, which is when the Supreme Court decided *Webb*, it has been clear that the Fourteenth Amendment's guarantee of due process precludes a trial court from infringing on a criminal defendant's Sixth Amendment right to present defense witnesses by delivering admonitions regarding the risks of testifying falsely in "unnecessarily strong terms." *Webb*, 409 US at 98.[4] Due

---

[3] The Fourteenth Amendment and the Fifth Amendment also guarantee the right to testify on one's own behalf. "The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony[.]" *Rock*, 483 US at 51. Additionally, "[t]he opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id.* at 52.

[4] *See United States v. Chavarria*, 312 Fed Appx 4, 6 (9th Cir 2008) (judge "drove" defense witness from the stand by speaking in a manner that "more than neutrally advise[d the] witness of his or her duties and rights"); *United States v. Blackwell*, 694 F2d 1325, 1334 (DC Cir 1982) ("[W]arnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify."); *United States v. Harlin*, 539 F2d 679, 681 (9th Cir 1976) (for admonition against perjury to violate due process, warning "needs to be threatening and employ coercive language indicating the court's expectation of perjury"); *Berg v. Morris*, 483 F Supp 179, 183-84 (ED Cal 1980) (threats by trial judge to defense witness, which included perjury prosecution, "denied [the defendant] his right to present the testimony of his witness"); *Arthur v. United States*, 986 A2d 398, 412 (DC 2009) (court committed "obvious" error when court's colloquy with the defendant regarding the defendant's invocation of the right to testify showed that "the court was not simply informing a defendant of his rights but imposing considerable pressure on the decision [the defendant] had already made"); *Reese v. State*, 382 So 2d 141, 143 (Fla Dist Ct App 1980) (judge's comments to defense witness about the consequences of perjury amounted to "prejudicial error"); *Woolfolk v. Com.*, 339 SW 3d 411, 417 (Ky 2011) ("[R]eversal may be required if [perjury warnings to a defense witness] are so strongly cast that they amount to deliberate and badgering threats designed to quash significant testimony, or otherwise intimidate a witness to the extent of interfering with the witness's free and unhampered choice to testify."); *State v. Melvin*, 388 SE 2d 72, 79 (NC 1990) (noting that mere warning of consequences of perjury does not violate due process, but that threatening and coercive warnings indicating that the court expects perjury do); H. D. Warren, Annotation, *Statements, comments, or conduct of court or counsel regarding perjury, as ground for new trial or reversal in civil action or criminal prosecution other than for perjury*, 127 ALR 1385, 1390 (1940) ("Any statement by a trial court to a witness which is so severe as to put him or other witnesses present in fear of the consequences of testifying freely constitutes reversible error."); *cf. State v. Jones*, 89 Or App 133, 138, 747 P2d 1013 (1987) (defendant's compulsory process rights are

process bars a trial court from delivering such warnings because they risk "exert[ing] such duress on the witness'[s] mind so as to preclude him from making a free and voluntary choice whether or not to testify." *Id.* And, when threatening warnings have the effect of driving a material witness for the defense from the stand, and the defendant is convicted, reversal is required "to repair the infringement of the [defendant's] due process rights under the Fourteenth Amendment." *Id.*[5] Although *Webb* addressed admonitions to a defense witness[6] who was not the defendant himself, it appears to us that all courts to have considered the question have concluded that its reasoning plainly precludes a trial court intimidating a defendant himself or herself from

---

violated when a defense witness invokes the right not to testify and "the state influenced the witness to invoke the right"); *People v. Bryant*, 157 Cal App 3d 582, 593, 203 Cal Rptr 733 (1984) (defendant's constitutional rights violated when prosecutor's words directed to defense witness were "not only threatening and coercive but, 'effectively drove [the] witness off the stand'").

[5] Courts have wrestled with whether to treat a trial court's error in delivering unnecessarily strong perjury warnings as structural error or as subject to harmless error review. *See Woolfolk*, 339 SW 3d at 418-19 (discussing the point). Most courts have concluded that a trial court's erroneously aggressive warnings about the consequences of testifying falsely are reviewed under the harmless error standard applicable to constitutional errors articulated in *Chapman v. California*, 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967). *See Woolfolk*, 339 SW 3d at 418-19. Under that standard, a constitutional error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 US at 24.

[6] In *Webb*, the Court concluded that the following admonition to the defendant's sole defense witness violated the defendant's due process rights when, following the admonition, the witness refused to testify:

"'Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the [likelihood] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.'"

409 US at 95-96.

testifying,[7] and the reasoning in *Webb* persuades us that that is the only possible conclusion to draw.

The line separating permissible cautionary advice about the dangers of perjury from impermissible coercion is not a clear one. Nonetheless, it is plain to us that the trial court's remarks here crossed that line. Although we appreciate that the trial court's remarks may have been motivated by a concern for defendant, and the desire to prevent defendant from making what the trial court perceived to be a mistake, the remarks went far beyond what was needed or appropriate to allow defendant to make an informed choice about whether to testify. Rather, the trial court's statement that it had already found the state's witnesses to be credible in their testimony about defendant's understanding of the restraining order would suggest to a person in defendant's position that the court had abandoned its role as a neutral factfinder and had already decided that if defendant testified, he would lie. *See Webb*, 409 US at 97 (trial court's admonitions violated due process when they communicated to defense witness that "the [court] expected [the witness] to lie"); *see also Arthur v. United States*, 986 A2d 398, 411 (DC 2009) (in cautioning a defendant, court must be careful not to create appearance of departing from role as neutral magistrate).

The court's subsequent statements would suggest further to a person in defendant's position that it would be better for defendant not to testify, in the light of the fact that the court had already determined that the state's witnesses were credible. The fact that the court reiterated that point after defendant's lawyer affirmatively informed the court that she did not expect defendant to lie would only

---

[7] *See United States v. Davis*, 974 F2d 182, 187 (DC Cir 1992) ("It seems only sensible * * * [that] judicial behavior aimed at dissuading the defendant himself—not merely his witnesses—from testifying would surely offend his statutory and constitutional rights."); *Arthur*, 986 A2d at 412 (judge's comments to defendant regarding his invocation of the right to testify constituted "obvious error"); *Woolfolk*, 339 SW 3d at 417 ("[I]t follows that the same reasoning would apply with even greater force if it is the defendant who is being intimidated."); *Marshall v. State*, 291 Md 205, 210-12, 434 A2d 555 (1981) (constitutional rights violated where judge's comments to the defendant "effectively conveyed to [the defendant] that if he were to testify in a manner contrary to [the state's witness], he would be punished").

serve to emphasize to defendant that the court had already made up its mind that defendant's testimony would not be truthful, and that defendant faced a significant risk of being penalized if he elected to testify. The court's reference to the immigration hold, and the court's statement that it would hold defendant, would also tend to indicate to someone in defendant's position that testifying would only make matters worse for defendant, regardless of whether defendant testified truthfully.

Finally, the trial court's remark about the risk to defendant of having "a middle class person with 35 years of legal experience think[] he's lying" would also have conveyed to someone in defendant's position the message that the particular trial judge presiding over his case had already determined that defendant would lie, especially if the judge appeared to be a "middle class person with 35 years of legal experience"—a message that would certainly drive someone in defendant's position from the stand. The court's reference to the class status of the decision maker—something that is irrelevant both to the determination of whether or not a witness is lying and to the determination of the appropriate sanctions for lying[8]—only enhanced the coercive tone of the remarks under the circumstances present here.[9]

We further conclude that the trial court's erroneous admonitions were not harmless beyond a reasonable doubt, and that the error therefore amounts to reversible error under *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967). *State v. Cook*, 340 Or 530, 135 P3d 260 (2006) (*Chapman* standard governs determination whether federal constitutional error is harmless). It is clear from the record that the trial court's colloquy caused defendant to elect not to testify, even though defendant had planned to testify. It is also apparent from the transcript

---

[8] Because a decision maker's class status *is* irrelevant to the determination of whether or not a witness is lying, or whether a witness should be sanctioned for lying, we recognize the possibility that the trial court may have intended to say something else when it made the reference to "middle class." Nonetheless, that was the term employed by the trial court, and we, therefore, must consider the message that that term conveyed to defendant.

[9] L's application for a restraining order contained in the trial court file, which was judicially noticed by the trial court, represents that defendant was homeless.

that defendant's defense—which turned on his understanding of whether the conduct forming the basis of the two contempt counts violated the restraining order—is one in which defendant's own testimony would be highly probative. And we are not persuaded that there is no possibility that defendant could have testified truthfully about his understanding of the contents of the order in a way that would undercut the state's case. It was undisputed that defendant could not read the restraining order and had to rely on others to translate it for him; it is not implausible to think that defendant may have come to an understanding of the order—perhaps even a reasonable one under the circumstances—that would cause him to believe that he was permitted to receive phone calls from L or to have contact with her when police were present, as they would be at a traffic stop.[10] But the trial court's admonitions "effectively drove [defendant] off the stand," precluding him from testifying to his own understanding of the contents of the restraining order and, consequently, precluding him from presenting a defense.

We have determined that the trial court's colloquy plainly violated the Fourteenth Amendment in view of *Webb*, and that that constitutional error was not harmless beyond a reasonable doubt under *Chapman*. Considering the gravity of the error, we exercise our discretion to correct it.

Reversed and remanded.

---

[10] Even setting aside the language barrier evidenced by the record, it is not implausible to think that defendant might have reasonably understood the order not to prohibit him from *receiving* a phone call from L, the conduct on which the second count of contempt was predicated. By its terms, the order specifies only that defendant was prohibited from "[c]ontacting, or attempting to contact, [L] by telephone, including cell phone or text messaging directly or through third parties," which suggests that the order only prohibited defendant from *initiating* (or attempting to initiate) contact with L. Although the order warns that defendant was required to comply with all provisions of the order even if L herself initiated contact, that warning does not, in and of itself, make clear that receiving a phone call from L was, itself, prohibited conduct, or that it fell within the prohibition on "contacting or attempting to contact" L.